**Philip James OSTRANDER, Petitioner–Appellant,**

v.

**Fred W. GREEN, Warden, Respondent–Appellee.**

No. 94–6396.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 3, 1994.

Decided Feb. 1, 1995.

**ARGUED:** Ira Nikelsberg, Nikelsberg & Rizzo, P.C., Fairfax, VA, for appellant. John H. McLees, Jr., Asst. Atty. Gen., Richmond, VA, for appellee. **ON BRIEF:** Lawrence Eliot Freedman, L. Freedman & Associates, P.C., Fairfax, VA, for appellant. James S. Gilmore, III, Atty. Gen. of Virginia, Richmond, VA, for appellee.

Before HALL and MICHAEL, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

Reversed and remanded by published opinion. Judge HALL wrote the opinion, in which Judge MICHAEL and Senior Judge CHAPMAN joined.

## OPINION

K.K. HALL, Circuit Judge:

Philip James Ostrander, a Virginia prisoner, appeals an order of the district court dismissing his petition for a writ of habeas corpus. We reverse.

### I.

### A.

Ostrander was a successful young businessman in the Virginia Beach area. In 1990, his fifteen-year-old sister-in-law, Dianne Howell, accused him of molesting her on several occasions beginning when she was thirteen. He was charged in a six-count indictment with three counts of carnal knowledge of a minor, two counts of sexual battery, and one count of sodomy.

He was represented at a preliminary hearing by his corporate lawyer, Gene Woolard. Woolard had not practiced criminal defense for some time, so Ostrander enlisted an experienced criminal defense lawyer, Louis Napoleon "Mike" Joynes, as co-counsel.

Two days before trial, Ostrander's family (his parents, Jim and Lillian Ostrander; his sister-in-law, Vicki Elliott; and a friend, Bonnie Basnight) met with his attorneys. Joynes reported that he had worked out a plea agreement with the prosecutor. Under the agreement, Ostrander would plead guilty to four of the six charges, and the Commonwealth would agree that the sentences would run concurrently, which exposed Ostrander to a 20–year maximum sentence. If convicted of all charges, and all sentences were imposed consecutively, Ostrander could have received as much as 75 years in prison. Joynes also allegedly assured Ostrander's family that his sentence would be "capped" at three to five years, that the Commonwealth had agreed not to oppose work release, that he knew the persons who ran the work release program very well, and that Ostrander's receiving work release was guaranteed.

Ostrander's parents reluctantly advised their son to take the deal. Ostrander agreed to plead guilty, though he maintains his innocence.

Ostrander pled guilty. Later, he was sentenced to twelve years in prison.[1] Within days of sentencing, Ostrander discovered that not only had he not been approved for work release, but also that he was ineligible for work release as a matter of law because of the nature of his offense. He quickly found a new lawyer and moved to withdraw his plea under Va.Code § 19.2–296, which permits such withdrawals after final judgment only on a showing of "manifest injustice."

### B.

The state court held a comprehensive two-day hearing on the motion. Ostrander testified first. He said that he spoke with Joynes and Woolard a day or two before his scheduled trial date. The attorneys explained the proposed plea agreement with him, but Ostrander was reluctant to plead guilty because, he asserts, he is innocent. Joynes assured Ostrander that he had a verbal agreement with the Commonwealth's attorney for a three-to-five year "cap" on the sentence and that there was a 75–80 percent chance Ostrander would be released on probation. In an earlier meeting, Joynes had "guaranteed" Ostrander that he would be placed on work release if there were "any problems." Joynes explained that he and Sheriff Drew were good friends, that he had "everything set up" for work release, and to expect Captain Palett to come to interview him for the program.

---

1. The sentencing was conducted by a different trial judge than the one who accepted the plea, which is not the customary practice of the state court. There is a great deal of dispute in the record as to the cause of and responsibility for this deviation, but it is not material to the constitutional issue before us.

Ostrander pled guilty in accordance with the written plea agreement. He did not enter an *Alford*[2] plea because his attorneys advised him just before the hearing that it "would make the judge mad."

On the day before sentencing, Ostrander's mother, his brother, Joynes, and Basnight met with him at the jail. The group discussed the upcoming sentencing. Joynes reported that if Ostrander did not receive probation, he would be out on work release within 24 or 48 hours, because "everything was already set up." According to Ostrander, this information confirmed what he had understood at the time of his plea. Joynes then told Ostrander and his family that he had given Sheriff Frank Drew a lot of wine "for the work release" and for taking Ostrander to a psychological evaluation. Joynes also reported that Captain Jack Palett was active in the Shriners, and that he had mentioned to Palett that Ostrander's business, Logo Lil's, could help out the Shriners with embroidery, hats, and the like if he were given work release.

Sheriff Drew testified next. He stated that he was not a "friend" of Joynes, that Lieutenant James Lindenbaugh ran the work release program, and that Captain Palett had no connection whatsoever with it. He denied ever receiving a gift of wine from Joynes, and he could not recall whether Joynes had ever mentioned Ostrander to him before the plea and sentencing. He said that his standard answer to work release inquiries is to direct the attorney to Lieutenant Lindenbaugh. Finally, Sheriff Drew stated that the work release regulations are "very simple," and those convicted of violent or sexual offenses are ineligible.

Captain Palett took the stand and testified that he has nothing to do with the work release program. He did recall speaking with Joynes a few months previously about a client of Joynes who was interested in work release, and he directed Joynes to speak to Lieutenant Lindenbaugh. He denied telling

Joynes that there would be "no problem" with securing his client a place in the program. He did confirm, though, that Joynes brought up Palett's involvement in the Shriners and said that his client owned a business that made T-shirts and hats, "[a]nd if I ever needed any, he would be a good man to get some from."

Bonnie Basnight, Ostrander's friend,[3] then corroborated certain aspects of his story. She was present at Joynes' office along with Ostrander's mother, father, and sister-in-law on the evening just before the plea. This group discussed the situation, and later telephoned Ostrander at the jail. Joynes explained the *Alford* plea, stated that there was "no problem whatsoever" with obtaining work release, and the sentence would be capped at three to five years under a verbal agreement Joynes had with the Commonwealth's attorney. According to Basnight, Joynes confidently reported that he was a personal friend of Sheriff Drew, there was "no question" but that Ostrander would be out on work release within 48 hours of sentencing, and he was going to give Sheriff Drew a bottle of wine for the favor. Basnight said that Ostrander's parents were very upset. His father was in tears, and he wanted his son to plead guilty so that there would be no risk of further jail time.

Basnight was also present at sentencing. When Ostrander received twelve years, she and the family were stunned. She and Ostrander's mother confronted Joynes and Woolard outside the courtroom. Joynes told them, "Don't worry about it. I'm going downstairs right now and talk with Sheriff Drew, and Philip will be out in forty-eight hours. He will be sitting at McDonald's with you eating lunch."

Mrs. Ostrander recounted many of the same details. She was somewhat consoled by the availability of the *Alford* plea, because she did not want her son to admit guilt when he was innocent. She also remembered Joynes' explaining the three-to-five year

**2.** *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (so long as there is evidence to provide a factual basis for it, a guilty plea that represents a defendant's knowing and intelligent choice among available alternatives is not invalid simply because the defendant does not admit actual guilt).

**3.** She denied being Ostrander's "girlfriend."

"cap" and guaranteeing work release. She was present when Joynes predicted that her son would probably get probation and, if not, would surely be out on work release within days. After the sentencing, she questioned Joynes about why her son had not entered an *Alford* plea, and Joynes told her that they had not wanted to make the judge mad. She stated that she would never have advised her son to plead guilty if she had not thought he would be on work release.

James Elliott, Ostrander's older brother, testified that he planned to employ his brother when he was out on work release.[4] He was present at the jail just before sentencing when Joynes advised that the work release "deal" was already set up with Sheriff Drew, and he was encouraged enough to make a date with his brother to watch Monday night football.

Elliott's wife Vicki, who had been present at the pre-plea meeting in Joynes' office, added her further corroboration to the "cap," the "guarantee" of work release, the bottle of wine for Joynes' "personal friend" Sheriff Drew, and the planned *Alford* plea.

Ostrander rested his case. The Commonwealth's case hinged on the testimony of Woolard and Joynes.

Woolard went first. After describing his prior representation of Ostrander and how Joynes was brought into the case, Woolard addressed some of Ostrander's allegations. He denied any knowledge of an agreement for a "cap." He did state that Ostrander had been advised that he might receive "extra credit" from the sentencing judge for entering a straight guilty rather than an *Alford* plea.

Woolard remembered that the plea agreement included a promise by the Commonwealth not to oppose work release—a promise he recalled seeing in writing—but he could not find the clause when presented with the actual written agreement.

Woolard confirmed other aspects of Ostrander's story. He heard Joynes say that he was a friend of Sheriff Drew, and he was present when Joynes discussed Shriners' hats with Captain Palett. Most importantly,

Woolard verified that after their discussion with Palett, Joynes told Ostrander that work release "should be no problem" and "looked good," though, he added, "there's no guarantees." On the afternoon following sentencing, Woolard visited Ostrander in jail and reported that Joynes was working on work release. In fact, Joynes stated as he left the sentencing, "I'm going right now to see the sheriff."

Woolard admitted that he did not know that Ostrander was ineligible for work release and had not made any inquiry about it, because he had relied on Joynes. Finally, though Woolard had been impressed by the complaining witness' demeanor at the preliminary hearing, he testified that Ostrander had steadfastly maintained his innocence in their many attorney-client discussions.

Joynes testified that there was no side agreement for a three-to-five year "cap." As for the planned *Alford* plea, Joynes said that Woolard had advised Ostrander that judges "are [not] that in favor of an Alford plea because it doesn't show any remorse on behalf of the defendant" and that he had concurred in that assessment. There "could have been" a discussion "in passing" with Captain Palett about Ostrander making hats for the Shriners. He admitted representing that he was "friendly" with Sheriff Drew, but denied the alleged bribe of wine.

On the work release issue, Joynes testified that Ostrander and his family "continually asked me whether I thought he would get work release," and that "I continually told them that it was up to the—the decision of the jail, but I did not think there would be a problem." He admitted that he had never spoken to Lieutenant Lindenbaugh about Ostrander. Likewise, he admitted that he left for vacation after the sentencing without speaking to the sheriff or anyone else about work release. Joynes denied telling Ostrander's family that work release was already set up, but he conceded that he "thought we could work [it] out." He confirmed that the Commonwealth's attorney had verbally agreed not to oppose work release. When asked whether he had told Ostrander or his

---

4. Ostrander's "Logo Lil's" was by then in bankruptcy.

family that he would be out in two days after sentencing, Joynes stated that he had said, "I hope so."

As had Woolard, Joynes testified that Ostrander had never admitted guilt to him, though Joynes suspected that his client was guilty because Ostrander did not feel he could pass a polygraph examination.

The Commonwealth's closing witness was Gary Blankenship, an inmate at the Virginia Beach Jail and also a client of Joynes. His direct testimony was marginally helpful to the Commonwealth,[5] but, on cross-examination, he provided Ostrander with a good sound bite, if nothing else. Blankenship testified that Ostrander was *happy* when he returned from being sentenced, and work release was the root of it all:

Q. You have been around the courts a little bit yourself I believe from the Commonwealth's exhibit. Did you understand why [Ostrander] was happy? Did you question him? "What are you? An idiot? Why are you happy? You got twelve years."

A. Man gets twelve years, he's got work release, I'd be doing back flips.

Q. Because that's ridiculous, isn't it?

A. Yes, sir.[6]

In a ruling from the bench, the court denied relief. The court found that Joynes and Woolard were "competent" and had rendered "adequate" representation, and that Ostrander's plea had been voluntarily and intelligently made. A panel of the Court of Appeals affirmed over a dissent, *Ostrander v. Commonwealth*, No. 1826–90–1 (Va.Ct.App., June 23, 1992), and the Supreme Court of Virginia summarily denied review. *Ostrander v. Commonwealth*, No. 921156 (Va.Sup. Ct., Oct. 1, 1992, as amended Oct. 21, 1992).

Ostrander filed this 28 U.S.C. § 2254 action in district court. The Commonwealth moved to dismiss without an evidentiary

hearing, based on various procedural rules and deference to the findings of fact of the state court. The district court granted the motion to dismiss. Ostrander moved to alter or amend, and the district court amended its opinion, though not its judgment.

Ostrander appeals.

## II.

■ In its first opinion, the district court applied the wrong legal standard to Ostrander's ineffective assistance claim. It used the *Strickland v. Washington*[7] test instead of the more specific *Hill v. Lockhart*[8] standard for guilty pleas induced by ineffective assistance. There is a significant difference between the tests. Under *Strickland*, the defendant shows prejudice if, but for counsel's poor performance, there is a reasonable probability that the outcome of the entire proceeding would have been different. Under *Hill*, the defendant must show merely that there is a reasonable probability that he would not have pled guilty and would have insisted on going to trial.

■ In a Rule 59(e) motion to alter or amend judgment, Ostrander pointed out the court's error and emphasized that there was a reasonable probability that he would have gone to trial if he had known that he was absolutely ineligible for work release. The district court applied *Hill* and rejected Ostrander's claim on its merits. The court went on, however, and held that Ostrander had not pled a "material misadvice" claim and could not do so for the first time in a Rule 59 motion.

In its brief, the Commonwealth repeats this holding and chides Ostrander for missing his "every opportunity" to assert such a claim. It continues,

[n]owhere in his habeas corpus petition, nor in any of his pre-judgment pleadings,

---

5. Blankenship testified that Ostrander was looking for people dissatisfied with Joynes and had offered to pay his new lawyer to represent Blankenship if he too wished to try to withdraw his plea.

6. A private investigator, Dennis Lanier, also testified for the Commonwealth, and Basnight took

the stand in rebuttal. Their testimony contained nothing of relevance here.

7. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

8. 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

did appellant comply with F.R.C.P. 8(a) by making a short and plain statement of his claim that material misadvice with respect to his eligibility for work release, in addition to the purported guarantee of work release, vitiated his guilty plea.

Brief of Appellee at 10.

■ First of all, we should say that the proffered distinction between a "guarantee" and "eligibility" is uncommonly subtle, if not downright illusory. *Every* guarantee of anything implies the ability of the promisor to deliver and of the promisee to receive. A habeas petitioner must plead his claims in reasonable detail, but he need not catalogue the most elementary connotations of his words on pain of waiving them.

In any event, the most conspicuous flaw in this argument is that its factual premise is just not so. In support of his ineffective assistance claim, Ostrander pled the following relevant facts (emphasis added):

23. Joynes advised that if he pled guilty, Ostrander's sentence would be capped at three to five years and he would get work release which would enable him to continue his business endeavors.

\* \* \* \* \* \*

25. Joynes advised that if Ostrander pled guilty, he would do all of his time in the City of Virginia Beach Correctional Facility's work release program.

\* \* \* \* \* \*

36. Since trial was only two days away, Petitioner felt that he had no choice but to accept the plea bargain since he would be getting work release and his counsel was not adequately prepared to proceed with trial.

\* \* \* \* \* \*

38. Joynes indicated to Petitioner and his family that work release was guaranteed.

\* \* \* \* \* \*

40. Joynes represented that Petitioner had a 75–80% chance of probation and that if Petitioner did not get probation then he would be out on work release within twenty-four to forty-eight hours which would

enable him to continue to operate his business.

\* \* \* \* \* \*

61. [Before sentencing,] Joynes told Petitioner that work release had already been arranged and that Ostrander would be released within forty-eight hours.

\* \* \* \* \* \*

64. Despite counsel's guarantee of work release, Petitioner was clearly not eligible for work release because of the nature of the charges against him.

\* \* \* \* \* \*

66. Any inquiry as to Petitioner's eligibility for work release would have resulted in a determination that Ostrander had no chance of being placed into the work release program.

\* \* \* \* \* \*

68. *Petitioner's reliance upon his attorneys' gross misinformation concerning his eligibility for work release induced him to plead guilty.*

Enough said. Ostrander pled the claim.

### III.

■ The Commonwealth next argues that a holding in Ostrander's favor on his ineffective assistance claim would constitute a "new rule" from which Ostrander may not benefit on collateral review. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). It acknowledges that Ostrander simply asks the court to apply the ineffective assistance test of *Hill v. Lockhart*, but, it asserts, unless *Hill* has been squarely applied to such a similar set of facts that any reasonable jurist would feel compelled to award the writ, the "new rule" doctrine prohibits addressing the merits of Ostrander's claim. Though the "new rule" doctrine is not jurisdictional, *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), we must address it in any case in which the state raises it. *Caspari v. Bohlen*, —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994).

The Commonwealth's brief was written before we decided *Turner v. Williams*, 35 F.3d 872 (4th Cir.1994). In *Turner*, we exhaustively discussed the Supreme Court's "new rule" jurisprudence and rejected similar contentions by the Commonwealth. Though a lengthy repetition of *Turner* would serve no purpose here, we should give a brief explanation of why there is no "new rule" bar in this case.

A "rule" is a principle of law we apply to the factual situations—be they few or many—within the rule's intended ambit. Though cases are the hardware out of which we fashion rules, rules are more than just cases. Sometimes courts fashion broad rules intended to govern an array of factual settings; often they frame more narrowly. When we ask whether a proffered holding would be a "new rule," we must therefore bear in mind the level of generality at which the prevailing rule or rules are meant to be applied. *Turner*, 35 F.3d at 883. Just as habeas petitioners could always avoid the *Teague* bar if we define "rules" at an abstractly broad level of generality (e.g. "due process"), so also could respondents erect the bar in almost every case if we characterize a "rule" as "the most specific conclusion or holding [the petitioner] hopes we reach[.]" *Id.* (emphasis in original deleted). History does repeat itself, but not frequently or comprehensively enough to provide a case law exemplar for every set of facts.[9]

Here we apply *Hill*'s ineffective assistance formula, "a rule designed for the specific purpose of evaluating a myriad of factual contexts, [so] it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Wright v. West*, — U.S. —, —, 112 S.Ct. 2482, 2499, 120 L.Ed.2d 225 (Kennedy, J., concurring in the judgment); *see also, id.* at —, 112 S.Ct. at 2497 (O'Connor, J., concurring in the judgment). Though Justice Kennedy's remark concerned the *Jackson v. Virginia* standard for evaluating the constitutional sufficiency of evidence of guilt, it is equally applicable to the *Hill–Strickland* ineffective assistance tests.[10] Indeed, the all but limitless number of evidentiary situations to which *Jackson* could apply may be approached only by the regrettably vast quantity of ways lawyers can discover to render incompetent assistance. Only a broad "normative" rule can assure any degree of fairness and consistency in evaluating ineffective assistance claims. An existing normative rule applied to a novel set of facts becomes "new" only if the rule's boundaries are extended, and not merely because its interstices are filled.

We need not, and are not asked to, extend *Hill* here. Consequently, the "new rule" doctrine does not bar our consideration of Ostrander's claim.

## IV.

■■■ We turn now to the merits of the ineffective assistance claim. Because ineffectiveness of counsel is a mixed question of law and fact, we owe no deference to the state court's holding on this issue. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070.[11]

9. The Commonwealth also asserts in its brief that only the decisions of the United States Supreme Court, and not of inferior tribunals like ours, constitute the prevailing rules for "new rule" purposes. While we disagree with this contention—the Court does not generally step in to simply place its imprimatur on fact-specific holdings or ones that generate no controversy in the circuits—we observe that accepting all of the Commonwealth's "new rule" arguments would leave an exceedingly small pool of exceedingly narrow "old" rules.

10. We have regularly applied both the *Jackson* and *Strickland* tests on collateral review of state convictions without undertaking "new rule" analysis. *E.g., Evans–Smith v. Taylor*, 19 F.3d 899, *cert. denied,* — U.S. —, 115 S.Ct. 298,

130 L.Ed.2d 211 (1994) (*Jackson*); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355 (4th Cir.1992) (*Strickland*). In *Turner*, though our panel split on the applicability of the *Teague* rule to most of petitioner's claims, we unanimously held that his ineffective assistance claim did not seek the benefit of a "new rule." *Turner*, 35 F.3d at 887; *id.* at 920 n. 14 (Luttig, J., concurring in the judgment).

11. The Commonwealth argues that this part of *Strickland* has been overruled by the Supreme Court's "new rule" cases, notably *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), and replaced by a broadly deferential standard, tolerant of all but clearly unreasonable applications of "old" rules by state courts. The Supreme Court declined to so hold

■ Though the state court found as a matter of historical fact that Joynes did not *guarantee* that Ostrander would get work release, the record establishes beyond cavil that Joynes and Woolard did in fact advise Ostrander that he was eligible for work release and had a very good prospect of quickly receiving it. Indeed, the state court found that Joynes and Woolard "were pressured time and time again by the defendant and family whether he could get work release [and] whether he would have to serve time," and that they explained to Ostrander "the possibility that he could be considered for work release."

■ We think that this misadvice falls well below the range of competence we must expect from defense lawyers. Ordinarily, an attorney need not advise his client of the myriad "collateral consequences" of pleading guilty. *United States v. McHan,* 920 F.2d 244, 247 (4th Cir.1990). However, where the client asks for advice about a "collateral consequence" and relies upon it in deciding whether to plead guilty, the attorney must not grossly misinform his client about the law. *Strader v. Garrison,* 611 F.2d 61 (4th Cir.1979).

Though the misadvice in *Strader* concerned parole eligibility, it is otherwise indistinguishable from this case. Strader asked his counsel whether imposition of a particular concurrent sentence would delay his parole eligibility date. Counsel said that it would not, and he was flatly wrong, as he would have discovered if he had read the applicable regulation. We held that Strader did not receive effective assistance.

■ The *Strader* court was careful to explain that there is a difference between a

bad prediction within an accurate description of the law and gross misinformation about the law itself. If the lawyer simply underestimates the sentence, there may not be ineffective assistance. *See, e.g., United States v. Lambey,* 974 F.2d 1389, 1394 (4th Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 672, 130 L.Ed.2d 605 (1994). But what if he tells his client that the statutory maximum is ten years, and it is actually life? We cannot expect criminal defense lawyers to be seers, but we must demand that they at least apprise themselves of the applicable law and provide their clients with a reasonably accurate description of it.

*Strader* has been followed in several cases in this and other circuits, most notably by the en banc Eighth Circuit on the second incarnation of *Hill. Hill v. Lockhart,* 894 F.2d 1009 (8th Cir.) (en banc), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 767 (1990). We conclude that its reasoning applies here, and the first prong of the *Hill* test is met.

■ *Hill* 's prejudice prong is a somewhat more difficult call. "Prejudice" is a reasonable probability that the defendant would have insisted on going to trial had he not received the ineffective assistance, and a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "Although [the *Hill* prejudice prong] focuses the inquiry on a subjective question, the answer to that question must be reached through an objective analysis." *Hooper v. Garraghty,* 845 F.2d 471, 475 (4th Cir.), *cert. denied,* 488 U.S. 843, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988).[12]

when it had the opportunity, *Wright v. West,* —— U.S. at ——, 112 S.Ct. at 2492 (plurality opinion), and has since applied the *de novo* standard to a mixed question without dissent on the point. *See Withrow v. Williams,* —— U.S. ——, ——, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993). In *Turner,* we expressly held that the "new rule" doctrine has not implicitly altered the standard of review. 35 F.3d at 886.

In addition, inasmuch as the state court found here that Ostrander's plea was voluntary and intelligent, it bears mention that the voluntariness of a plea is also a mixed question reviewed *de novo* on federal habeas. *Marshall v. Lonber-*

ger, 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983).

12. Objective analysis of the prejudice prong is probably the only workable means of applying *Hill,* but this remark from *Hooper* suggests that not all of the rationale underlying the *Strickland* test comfortably fits its *Hill* cousin. In a *Strickland* case, we can logically apply objective analysis to the prejudice prong because we can assume that the trier of fact acted rationally and in accordance with the law, and we can assume that a hypothetical trier of fact at a trial untainted by incompetent assistance would do the same. In the guilty plea context, the entity in control of

The potential strength of the state's case must inform our analysis, inasmuch as a reasonable defendant would surely take it into account. *See Hill,* 474 U.S. at 59–60, 106 S.Ct. at 370–71. Here we have only Woolard's assessment that the complainant was an excellent witness who had not been shaken by cross-examination at the preliminary hearing. There was no physical evidence; indeed, the only corroboration identified by the state is a hearsay statement made by the complainant to a friend while the alleged abuse was going on. In sum, the Commonwealth's case depended on the credibility of a single witness, which, of course, could have proved to be more than enough, but which is hardly invincible on its face.

We restate the issue: do we remain confident that a reasonable defendant in Ostrander's shoes, having asked for, received, and relied upon encouraging advice about the prospect of serving much if not all of his sentence on work release, would have pled guilty anyway had he known that he had no chance whatsoever of serving his time anywhere but in jail?

The blunt answer is that we do not. A reasonable defendant sitting in jail and facing a difficult decision that may subject him to many more years of the same could certainly be swayed by Joynes' confident, though grossly uninformed, prediction that he would probably be breathing free air within days. Reasonable persons seek freedom from state restraint. If they do not, then the premise that imprisoning criminals deters crime is gravely flawed. Work release is not unrestricted liberty, but then neither is pa-

role, and the difference between the two is thus more of degree than of kind. As Blankenship so colorfully put it, a reasonable defendant in Ostrander's shoes would "be doing back flips." [13] If the shoes had fit, that is.

### V.

Ostrander raised, and the district court rejected, other grounds for relief, and he has renewed these on appeal. Because we hold that the writ must issue on the ineffective assistance claim, any opinion we would render on Ostrander's other claims would be purely advisory; hence, we will not address them.

The judgment is reversed, and the case is remanded to the district court with instructions to grant a summary judgment [14] awarding the writ.

*REVERSED AND REMANDED.*

the result—the defendant—has unchecked subjective authority to insist on going to trial. In other words, he has the *right* to act *unreasonably.* Thus, if incompetent assistance has actually caused him to forgo this fundamental personal right, one might think that the Sixth Amendment has been violated, notwithstanding that many, most, or even all "reasonable" defendants would have pled guilty anyway.

13. The subjective evidence, such as it is, also supports our holding. The centrality of work release to Ostrander's decision—and to the family advice on which it relied—is clear from the testimony of all involved. While we might expect, without more, that the *post hoc* testimony of Ostrander and his family would have the con-

sistency of a script on this point, it was lent credibility by Joynes' testimony that they badgered him about Ostrander's work release prospects "continually." This badgering does not surprise us. A reasonable person facing the loss of his freedom would of course grasp at a promising opportunity to preserve a great deal of it.

14. Because of the fullness of the state hearing, the *de novo* standard of review for the mixed question presented, and the adequacy of the state court's findings of historical fact, no supplementation of the record or evidentiary hearing is necessary. *See* 28 U.S.C. § 2254(d); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).