**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOSEPH JOHN SAVINO,
Petitioner-Appellant,

v.

No. 95-4006

EDWARD W. MURRAY, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-93-869-R)

Argued: December 7, 1995

Decided: April 30, 1996

Before MURNAGHAN, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Luttig and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Gerald Thomas Zerkin, GERALD T. ZERKIN & ASSO-
CIATES, Richmond, Virginia, for Appellant. Eugene Paul Murphy,
Assistant Attorney General, OFFICE OF THE ATTORNEY GEN-
ERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Melanie A.
Hopper, GERALD T. ZERKIN & ASSOCIATES, Richmond, Vir-
ginia; Donald R. Lee, VIRGINIA CAPITAL REPRESENTATION

RESOURCE CENTER, Richmond, Virginia, for Appellant. James S. Gilmore, III, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Virginia death row inmate Joseph John Savino, Jr., has appealed a federal district court's decision dismissing his petition for a writ of habeas corpus and denying his motion to alter or amend the judgment. Savino contends that the district court improperly found no merit in his constitutional claims concerning ineffective assistance of counsel, improper acceptance of his guilty plea, and impermissible use of expert testimony to be without merit. Because we agree with the district court's analysis and conclusions, we affirm the judgment below.

I.

On the night of November 29, 1988, Thomas McWaters was murdered at his farmhouse in Bedford County, Virginia. Two days later, Joseph Savino confessed to killing McWaters by repeatedly striking him on the head with a hammer and stabbing him in the neck and back.

At the time of the murder, Savino and McWaters lived together on McWaters's farm. They had met in 1980 when Savino worked for McWaters's construction firm while on parole from a New York prison sentence. In 1982, Savino was convicted of two counts of robbery and reincarcerated. During the next six years, McWaters frequently visited Savino in prison, communicated with him by telephone and gave him money. In return, Savino wrote affectionate letters to McWaters suggesting that they begin a homosexual relationship.

When Savino was paroled from prison in February 1988, he moved into McWaters's home. The two men became lovers. Later that year,

2

Savino began using cocaine. Without permission, he wrote checks on McWaters's checking account in order to purchase drugs. When he overdrew the account, Savino faced twenty-six forging and uttering charges in Bedford County. Before Bedford authorities could find him, however, police in Roanoke, Virginia, arrested him on November 22, 1988, for possessing cocaine and drug paraphernalia. Released on a bail bond November 29, 1988, Savino returned to McWaters's farm.

That same evening, Savino spoke with a friend by telephone about killing McWaters, as he had done on previous occasions.[1] Later that night, Savino used cocaine, then joined McWaters in bed. When Savino refused to have sex, McWaters told him that he was "washing his hands of [him]." Savino went downstairs, thought a while and decided to "eliminate the problem." He picked up a hammer and returned to the upstairs bedroom where McWaters was sleeping. He struck McWaters on the head several times with considerable force. Believing McWaters still to be alive, Savino retrieved two knives from downstairs and stabbed him repeatedly in the neck and back. Leaving the knives in the victim's body, Savino took about $100 in cash and drove to Roanoke to purchase cocaine. Later that night, he revisited McWaters's house, loaded a car with his own property and some items belonging to McWaters, and then returned to Roanoke. The next day, November 30, 1988, police arrested Savino in Roanoke for failure to appear in court on the earlier drug charges.

Bedford authorities picked up Savino in Roanoke and took him back to their county jail to process him on the forging and uttering charges. They reported that, at first, Savino appeared lethargic and under the influence of drugs, but that by the time they arrived in Bedford County, he seemed substantially improved. Bedford police questioned Savino about the forgeries of McWaters's checks until he requested counsel. As officers processed the forgery warrants, a sergeant asked Savino why he had killed McWaters. Savino ended the interview, but after sleeping for several hours in a jail cell, he asked

_____

[1] These facts were derived mostly from Savino's own testimony at the state plea proceeding on June 13-15, 1989, and the state habeas hearing on July 21-22, 1992.

to speak with a particular investigator, Steve Rush. In two separate statements, Savino then confessed to killing McWaters.

A Bedford County grand jury indicted Savino on capital murder and robbery charges on December 2, 1988.**2** The court appointed counsel to represent Savino. On April 24, 1989, the day his jury trial was set to begin, Savino pled guilty to the charges. Pursuant to Virginia's bifurcated-trial procedure, the trial judge heard three days of testimony at the penalty phase.**3** On June 15, 1989, the judge found Savino to be a future danger and imposed a sentence of death. After reviewing the post-sentence report, he entered final judgment on July 20, 1989, sentencing Savino to death for the capital murder and to life imprisonment for the robbery.

On direct appeal, the same court-appointed counsel represented Savino. The Virginia Supreme Court affirmed Savino's convictions, then independently reviewed Savino's sentence and found it neither excessive nor disproportionate. The United States Supreme Court denied certiorari on October 1, 1990. Savino then filed a habeas corpus petition in the Circuit Court of Bedford County, raising numerous challenges to his death sentence. After two evidentiary hearings, the circuit court entered an order dismissing the petition on June 5, 1992. The Virginia Supreme Court denied Savino's appeal on October 30, 1992, and the United States Supreme Court again denied certiorari on March 22, 1993.

Savino filed a federal habeas petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Virginia on November 17, 1993. He raised fourteen claims. The district court dismissed the petition on March 1, 1995, and denied a motion to amend or alter the judgment on June 7, 1995. Savino filed a timely

_____

**2** The indictment charged that Savino "did willfully, deliberately, feloniously and with premeditation, kill and murder Thos`Thomas' McWaters, Jr. in the commission of robbery while armed with a deadly weapon," in violation of Va. Code Ann. § 18.2-31(d). The indictment also charged the underlying robbery.
**3** Under Va. Code Ann. § 19.2-264.4, the guilt and penalty phases of a capital murder case are conducted in separate proceedings.

4

appeal, challenging the district court's decision only with respect to his legal representation, guilty plea and future dangerousness.

## II.

We review the district court's legal determinations de novo, keeping in mind, however, that any state court factual findings underlying those determinations are presumed to be correct and binding, as long as they were made after a hearing on the merits. 28 U.S.C. § 2254(d); see also Sumner v. Mata, 449 U.S. 539, 550 (1981). The habeas petitioner bears the burden of establishing by convincing evidence that a state court's factual determinations were erroneous. Sumner, 449 U.S. at 550.

### A. Ineffective Assistance of Counsel

The record shows that Savino insisted upon pleading guilty against the defense counsel's advice. Before he entered his plea, Savino's appointed attorneys worked to prepare his case, consulting capital defense experts and investigating possible defenses. They discussed alternative strategies with Savino and advised him that by pleading guilty he would waive his rights to appeal his conviction. At the plea hearing, the state court judge reviewed a signed memorandum of understanding between Savino and his counsel.[4] Savino told the judge that his attorneys had reviewed the document with him and explained in detail the items it contained.[5] In open court, Savino told the judge that he understood everything in the memorandum, that he was satis-

_____

[4] Such memoranda are routinely required by the judges in that circuit.
[5] In the memorandum, Savino stated that he had told his lawyers all of the facts and circumstances surrounding the case and that his lawyers had discussed with him the nature of the charges against him and the possible defenses he might have. Savino further represented that his attorneys had explained, and that he understood, all of the elements of the offenses with which he had been charged and that would have had to be proved before he could be found guilty. The memorandum set forth all of the rights that Savino would have if he entered a plea of not guilty and conveyed his understanding that by pleading guilty he would waive those rights and "all objections to the admissibility of the statement to Investigator Rush and all other evidence."

fied with the service of his attorneys, and that he was pleading guilty voluntarily.

Savino now argues, and argued below, that his plea was not knowing and voluntary because his lawyers misadvised him. Savino contends that three viable defenses existed which counsel failed to disclose or pursue. He contends that he would not have pled guilty if he had known about these defenses, but rather, would have chosen to pursue them at trial because each was supported by substantial evidence. Savino maintains that his plea is particularly questionable because he received no benefit from it--no promise of a shorter sentence or a lesser charge in exchange. Whether counsel's performance was constitutionally adequate is a mixed question of law and fact which we review de novo. Ostrander v. Green, 46 F.3d 347, 354 (4th Cir. 1995); Poyner v. Murray, 964 F.2d 1404, 1416 (4th Cir.), cert. denied, 506 U.S. 958 (1992).

The standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), governs Sixth Amendment ineffective assistance of counsel claims. In order to succeed, a criminal defendant must show, first, that he received deficient legal representation, and second, that the unprofessional errors prejudiced his case. Id. at 688, 694. Competency is measured against what an objectively reasonable attorney would have done under the circumstances existing at the time of the representation. Id. at 687-88. Because counsel's conduct carries a strong presumption of reasonableness, reversal is warranted only if the defendant can affirmatively prove prejudice. Id. at 689, 693. In the context of a guilty plea, the prejudice inquiry is"whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill v. Lockhart, 474 U.S. 52, 59 (1985). The defendant must show that "there is a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial." Id. Because a guilty plea is valid only if it represents a knowing and voluntary choice among alternatives, Hill, 474 U.S. at 56, a client's expressed intention to plead guilty does not relieve counsel of their duty to investigate possible defenses and to advise the defendant so that he can make an informed decision, see Via v. Superintendent, Powhatan Correctional Center , 643 F.2d 167, 174 (4th Cir. 1981) (discussing obligations of defense counsel). However, if there exists no reasonable probability that a possible defense

6

would have succeeded at trial, the alleged error of failing to disclose or pursue it cannot be prejudicial. <u>Hill</u>, 474 U.S. at 59.

Reviewing each of Savino's allegations of ineffectiveness in turn, we find no constitutionally deficient performance. In light of both the circumstances and the law at the time, Savino's attorneys made reasonable determinations and provided adequate representation. Therefore, we need not analyze for prejudice.

1. Illegal Confession

Before Savino entered his guilty plea, his attorneys discussed the police questioning with him and advised him that a motion to suppress his confession was unlikely to succeed. He now argues that his attorneys should have filed a motion to suppress anyway because, at the very least, the Commonwealth would have been forced to prove his confession untainted. Savino maintains that a suppression motion was likely to be granted, however, because police officers violated his Fifth Amendment rights by questioning him about McWaters's murder after he had asked for a lawyer. Because Savino responded to the questioning by saying he would talk with investigators in the morning, he contends that the improper interrogation led to his confession later that day, rendering it tainted and inadmissible.[6]

In <u>Edwards v. Arizona</u>, 451 U.S. 477, 484 (1981), the Supreme Court ruled that once a defendant has invoked his constitutional rights and requested an attorney under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), any confession obtained by interrogation reinitiated by police in the absence of counsel is inadmissible. <u>See also Arizona v. Roberson</u>, 486 U.S. 675, 687-88 (1988) (holding <u>Edwards</u> bars police-initiated interrogation following a suspect's request for counsel in the context of a separate investigation). If, however, the <u>defendant</u> reinitiates discussion with police and then confesses, the statement may be admissible.[7] <u>Minnick v. Mississippi</u>, 498 U.S. 146, 156

_____

[6] Savino actually made two incriminating statements on December 1, 1988--one at 1:00 p.m., and another at 4:25 p.m.
[7] The <u>Edwards</u> rule was designed to preserve the integrity of the accused's choice to communicate with police only through counsel.

(1990); <u>Edwards</u>, 451 U.S. at 485. A defendant who ends police-initiated interrogation by requesting counsel, then specifically calls for an officer with whom to talk about the incident in question, has reinitiated further conversation for <u>Edwards</u> purposes. <u>United States v. Comosona</u>, 848 F.2d 1110, 1112-13 (10th Cir. 1988); <u>McCree v. Housewright</u>, 689 F.2d 797, 802 (8th Cir. 1982), <u>cert. denied sub nom.</u>, 460 U.S. 1088 (1983).

Applying these principles, Savino clearly reinitiated contact before confessing to investigators. Following his arrest, Bedford police officers questioned Savino about forged check charges until he requested an attorney. When an officer subsequently--and improperly--asked Savino why he killed McWaters, Savino responded "you're crazy," but gave no inculpatory answer. Officers apparently continued discussing McWaters's killing with Savino, at one point tossing a picture of the dead man's body on the table before him. Finally, Savino said he would speak with officers in the morning after he had gotten some sleep. When he awoke about 1 p.m., Savino asked to speak with Investigator Rush by name. He then sent a note requesting to see the investigator. At the onset of the interview, Savino both orally and in writing waived his constitutional rights. He confirmed that he had initiated the contact with police. Only then did Savino confess to the crimes. The record shows that Savino reaffirmed the voluntary nature of his statements throughout the interrogation. At the start, he asked Rush to allow him to tell his story straight through without questions. After doing so, Savino indicated that he knew his confession was against his best interests because it eliminated any possible defense to the crime, but he observed: "[W]hat I did was so terrible that . . . I don't really deserve a day in court."**8**

_____

<u>Patterson v. Illinois</u>, 487 U.S. 285, 291 (1988). Specifically, <u>Edwards</u> and its progeny seek "to prevent police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights." <u>Minnick v. Mississippi</u>, 498 U.S. 146, 150 (1990) (quoting <u>Michigan v. Harvey</u>, 494 U.S. 344, 350 (1990)).

**8** A few hours later, Savino gave the second statement in which he again confessed to the crimes after being reminded of his constitutional rights.

8

Savino later described the interrogation to his attorneys. Savino explained that he had wanted to talk to the officers, that nothing they said or did caused him to confess, and that his statements were true. Applying the existing law to these facts, we find that it was reasonable for Savino's attorneys to conclude that their client had voluntarily reinitiated contact with police. Furthermore, it was logical to surmise that his statements would be ruled admissible if challenged.

Even assuming, as Savino contends, that the officer's question during processing was improper interrogation and that defense counsel failed to recognize it as such, the statement elicited was not self-incriminatory and thus not protected by Edwards , 451 U.S. at 485-86. Furthermore, the fact that Savino initiated the later police contact eliminates any taint that might have arisen from the earlier questioning. In Edwards, the Supreme Court explained that once a defendant initiates discussion with authorities, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial." Edwards, 451 U.S. at 485.

Finally, we find little if any evidence in the record to support Savino's contention that his physical condition at the time of his statements precluded their voluntariness. Savino advised his attorneys that he was not under the influence of cocaine at the time he confessed. Even if he had been intoxicated when arrested in Roanoke, officers testified that he seemed normal by the time he reached Bedford County. In addition, Savino slept several hours before meeting with police again after the initial interview. Savino initiated that contact and expressly waived his Miranda rights after being reminded of them. Defense attorneys testified that they did consider moving to suppress Savino's statements on the basis of his mental and physical state, but after reviewing his medical evaluation and discussing his mental condition, they decided that there was no evidence to support a claim of involuntary confession.

In light of all of the evidence regarding Savino's statements to police and the information known to his attorneys, we cannot say that Savino's counsel performed unreasonably or inconsistently with existing law in their treatment of his confession.

9

2. Robbery Predicate Challenge

Savino also contends that counsel provided poor representation by failing to challenge the robbery predicate to the capital murder charge. We disagree.

Under Virginia law, murder in the commission of a robbery is "a killing which takes place before, during, or after the robbery and is so closely related thereto in time, place, and causal connection as to make the killing part of the same criminal enterprise as the robbery." George v. Virginia, 411 S.E.2d 12, 20 (Va. 1991) (citing 1981 and 1982 opinions), cert. denied, 503 U.S. 973 (1992); see also Harward v. Virginia, 330 S.E.2d 89, 91 (Va. 1985) (explaining that the language "during the commission of" in § 18.2-31 can include a killing before, during or after the underlying felony). Thus, robbery need not be the sole motive to sustain a charge of capital murder during the commission of a robbery in Virginia. George, 411 S.E.2d at 21. To prove a defendant guilty, the prosecution must show that the murder and the robbery "were interdependent objects of a common criminal design." Quesinberry v. Virginia, 402 S.E.2d 218, 224 (Va.), cert. denied, 502 U.S. 834 (1991). The fact that stealing occurs after the killing does not prove that the decision to steal was an afterthought and the two crimes were unrelated. Whitley v. Virginia, 286 S.E.2d 162, 166-67 (Va.), cert. denied, 459 U.S. 882 (1982).

Based on the evidence before us, a reasonable person could find that Savino committed robbery in connection with McWaters's murder. The record shows that Savino was in possession of McWaters's wallet when he was arrested. He admitted that he took McWaters's cash immediately after the murder and that he stole jewelry and other property belonging to the victim when he returned to the house later that night. He also told police that he had been planning to murder McWaters and then to escape with a friend to "South America or Mexico or something like that" afterward. Although there was some evidence that the plan never existed, a reasonable person could find the scheme linked to Savino's theft of McWaters's money and jewelry. In addition, because Savino also told police,"all I wanted is the cocaine," the Commonwealth could have succeeded in arguing that Savino's drug habit induced both the killing and the robbery. Either

10

theory would satisfy the capital murder requirement that robbery was a motive that existed at the time of the killing.

Savino's attorneys testified that they knew the state of Virginia law regarding capital murder during the commission of a robbery at the time they handled Savino's case. They stated that they considered the evidence against Savino and the possible prosecution arguments. The attorneys discussed the matter with Savino, among themselves, and with experts at the Washington & Lee Capital Litigation Project. Based on the information before them and the requirements of Virginia law, we find that the attorneys had sufficient reason to conclude that there was little chance of defeating the Commonwealth's proof that Savino murdered McWaters during the commission of a robbery. It was not an unreasonable strategy to forego the defense.

3. Intoxication Defense

Finally, Savino maintains that his attorneys should have pursued, or at least discussed with him, a defense of diminished capacity due to intoxication to both the capital murder charge and the lesser included offense of first degree murder. Again, we cannot agree.

Under Virginia law, mere intoxication does not negate premeditation. Fitzgerald v. Virginia, 292 S.E.2d 798, 807 (Va. 1982), cert. denied, 459 U.S. 1228 (1983); Giarratano v. Virginia, 266 S.E.2d 94, 99 (Va. 1980), cert. denied, 498 U.S. 881 (1990). A defendant may avoid conviction of capital or first degree murder if he can prove that he was so greatly intoxicated at the time of the killing that he could not deliberate or premeditate. Essex v. Virginia , 322 S.E.2d 216, 220 (Va. 1984); Fitzgerald, 292 S.E.2d at 807; Johnson v. Virginia, 115 S.E. 673, 675-76 (Va. 1923). Even in the face of evidence of extreme intoxication from alcohol or drugs, the factfinder may find willfulness, premeditation and deliberation if there is proof that the defendant was "in full control of his faculties and knew exactly what he intended to do." Fitzgerald, 292 S.E.2d at 807; see also Johnson, 115 S.E. at 675.

We do not believe that Savino could have presented a viable intoxication defense. Although Savino admitted he had used cocaine on the night of the murder and a defense expert concluded that he was suf-

11

fering from a cocaine-linked psychosis and possibly delusions at the time of the killing, the evidence is more than sufficient to show premeditation. Savino has offered no proof that cocaine made him incapable of deliberation or that he did not intend to kill.

Savino's statements to police reveal the actions of a person who, although possibly "high," was thinking in a logical, deliberate and evil manner. He admitted that he had discussed with a friend the idea of killing McWaters and even a possible method: strangulation with a phone cord. Savino explained that he sat downstairs contemplating the murder before he actually committed it. Then, he got a hammer, went upstairs, beat McWaters, returned downstairs for knives, and stabbed McWaters until he was dead. Savino told police that he knew that it was risky to use the telephone at the house after the killing, so he decided to use a pay phone. Finally, Savino seemed to display complete and clear recall of the events when recounting the killing to police and to defense counsel.

Savino's attorneys testified that they considered his conduct before and around the time of the killing and researched the extent of intoxication necessary to preclude premeditation in Virginia. They concluded that the Commonwealth could prove that premeditation had been present and that Savino's deliberate acts before, during and after the murder demonstrated no inability to know right from wrong or to make a deliberate decision. Again, we conclude that, in light of the facts before them, the attorneys' decision was consistent with controlling Virginia law and constitutionally sufficient.

Because the record so clearly indicates that Savino's attorneys investigated possible defenses, made strategic choices, and then rendered advice and representation consistent with both controlling law and the circumstances of the case, we agree with the district court that there has been no showing of deficiency. There is, therefore, no need to determine whether Savino was prejudiced by counsel's conduct.

B. Guilty Plea

Savino next complains that the trial court violated his Fourteenth Amendment rights by accepting his guilty plea without affirmatively establishing on the record that the plea was knowing and voluntary.

12

We agree with the Commonwealth that the claim is both procedurally defaulted and without merit.

Under Virginia law, trial errors that could have been but were not presented on direct appeal may not be raised in habeas corpus proceedings. Slayton v. Parrigan, 205 S.E.2d 680, 682 (Va. 1974), cert. denied sub nom., 419 U.S. 1108 (1975). Such claims are also barred on federal habeas review. Harris v. Reed , 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 87 (1977). Only when the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice," may the federal habeas court consider the challenge. Coleman v. Thompson, 501 U.S. 722, 750 (1991); Harris, 489 U.S. at 262.

Savino alleges a trial court error of the sort barred by Slayton and Dodson. He argues, however, that his claim should be considered on the merits because it is akin to an ineffective assistance of counsel claim which could not have been raised on direct appeal. The comparison fails, however. The error was allegedly committed by the court, not counsel, and thus Savino's attorneys would not have had to concede ineffectiveness in order to present the challenge. Savino's own argument that the error is obvious from the transcript of the plea proceeding further demonstrates that the claim could have been raised on direct appeal. Because Savino failed to present the issue on direct appeal when he could have done so, the state habeas court found the claim procedurally defaulted under Slayton. The Virginia Supreme Court then refused to review the claim as procedurally defaulted, thus foreclosing federal court review under Sykes and its progeny. See Coleman, 501 U.S. at 750 (the procedural default is considered an adequate and independent state ground that forecloses review of the claim in federal court); Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991). Because Savino has shown neither "cause" and "prejudice" for his default nor alleged a fundamental miscarriage of justice, we are precluded from considering his claim on the merits.

Even if we did reach the substance of Savino's claim and review it de novo, see Marshall v. Lonberger , 459 U.S. 422, 431 (1983) (stating that voluntariness of a plea is a mixed question of law and fact appropriate for de novo review), we would not rule it meritorious. The

13

record indicates that Savino was adequately informed of the nature and the consequences of his guilty plea. Before taking the plea, the trial judge reviewed the memorandum of understanding with him in open court. The judge confirmed that Savino read and understood the memorandum, then signed it with full knowledge. In response to the judge's questions, Savino declared that his plea was free and voluntary. The colloquy, coupled with the substance of the memorandum, more than satisfies the concerns articulated in Boykin v. Alabama, 395 U.S. 238, 243-44 (1969) (finding that courts may not presume from a silent record a waiver of constitutional rights associated with a not guilty plea, but must engage in a thorough, on-the-record inquiry to establish that the defendant voluntarily and understandingly enters his guilty plea). See also Wade v. Coiner, 468 F.2d 1059, 1060 (4th Cir. 1972) (holding that a state judge may satisfy Boykin concerns by ensuring that an attorney has advised the defendant of the nature of the charge and the consequences of his plea). In addition, such in-court representations from the defendant are treated as conclusive with regard to the validity of the plea and may not be controverted later absent some compelling reason, which Savino has failed to present. See Via, 643 F.2d at 171. Moreover, when a defendant making a guilty plea is represented by counsel, as Savino was, his plea is strongly presumed to be valid in subsequent habeas proceedings. United States v. Custis, 988 F.2d 1355, 1363 (4th Cir. 1993), aff'd, 114 S.Ct. 1732 (1994). For these reasons, we would agree with the district court's conclusion that the record demonstrates that Savino's plea was knowing and voluntary.

C. Mental Health Expert Testimony

Savino's final argument is that testimony by the Commonwealth's mental health expert regarding future dangerousness violated his Fifth Amendment right against compelled self-incrimination and his Sixth Amendment right to effective assistance of counsel. We find no such violations.

The United States Supreme Court has held that a capital defendant who undergoes psychological evaluation and faces the results of that examination as evidence at the penalty stage is protected by both the Fifth and Sixth Amendments. Estelle v. Smith, 451 U.S. 454, 471 (1981). Under the Fifth Amendment, the defendant is entitled to

14

warning before the evaluation that he has the right to remain silent and that if he waives that right by cooperating, his statements to the evaluator may be used against him at the penalty phase. Id. at 462-63. The defendant also has a Sixth Amendment right to effective assistance from his attorney regarding the decision of whether to cooperate, which requires that his attorney receive notice of the scope, nature and intended uses of the evaluation. Id. at 470-71. Both amendments thus require clear notice to the defendant and his counsel regarding any psychiatric evaluation by the prosecution. Id. at 471.

In Smith, the Court differentiated between a defendant who intends to introduce psychiatric evidence on his own behalf and one who "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence." Id. at 468, 472. When a defendant asserts a mental status defense and introduces psychiatric testimony in support of that defense, he may face rebuttal evidence from the prosecution taken from his own examination or he may be required to submit to an evaluation conducted by the prosecution's own expert. Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987); Smith, 451 U.S. at 465. That defendant has no Fifth Amendment protection against the introduction of mental health evidence in rebuttal to the defense's psychiatric evidence. Powell v. Texas, 492 U.S. 680, 684-85 (1989); Buchanan, 483 U.S. at 422-23. In essence, the defendant waives his right to remain silent--but not his right to notice--by indicating that he intends to introduce psychiatric testimony. Powell, 492 U.S. at 685.

In Virginia, the statutory scheme set forth in Va. Code Ann. § 19.2-264.3:1 governs the use of psychiatric testimony in a capital case.[9]

_____

[9] In subsection A, the statute provides that upon the request of an indigent capital defendant, the trial court must appoint a mental health expert to evaluate the defendant and assist the defense with regard to the defendant's history, character, or mental condition. According to subsection E, a capital defendant planning to present the expert's testimony at sentencing in support of mitigation must notify the Commonwealth. Only then, subsection F specifies, may the Commonwealth seek appointment of its own expert to examine the defendant concerning mitigating circumstances. If the defendant refuses to cooperate, he may lose the right to use his own expert's testimony in mitigation.

15

The provisions operate to notify the defense that its decision to introduce psychiatric testimony constitutes a waiver of the defendant's right to remain silent during examination by the Commonwealth's mental health examiner. The statute treats the defendant's waiver as a condition precedent to the prosecution's use of psychiatric evidence. See Washington v. Murray, 952 F.2d 1472, 1480 (4th Cir. 1991) (construing Virginia statute). It details the conditions under which the Commonwealth is entitled to have an examiner evaluate the defendant and outlines the scope and permissible uses of that examination. Va. Code Ann. § 19.2-264.3:1(F) & (G).

In preparation for the penalty phase of the trial, Savino's counsel moved the court for appointment of a mental health expert, pursuant to Va. Code Ann. § 19.2-265.3:1(A). Several months later, the defense gave notice that it intended to present information from the court-appointed expert, Dr. Lisa Hovermale, to support a claim in mitigation. Soon after, the court granted the Commonwealth's motion for appointment of a second expert under § 19.2-265.3:1(F). The Commonwealth indicated that, if Savino were convicted, it would present at sentencing the report of that expert, Dr. Arthur Centor. At the penalty phase, Dr. Centor did testify, stating that there was a "high probability" that Savino would be a future danger to society.

It is clear that Savino waived his Fifth Amendment rights by requesting a psychiatric evaluation pursuant to the applicable statute. The statute, both on its face and by operation, provided the defense with adequate notice of the waiver. That notice was supplemented by the Smith line of cases. See Buchanan , 483 U.S. at 425 (stating that Smith put defense counsel on notice of the waiver). Furthermore, both defense counsel and the Commonwealth's expert had warned Savino beforehand that any information he gave to the psychiatrist could be used in the capital sentencing phase. Under our precedent, such advice precludes a defendant's Fifth Amendment claim. Giarratano v. Procunier, 891 F.2d 483, 487-88 (4th Cir. 1989), cert. denied, 498 U.S. 881 (1990).

The statute also provided adequate warning of the scope of the Commonwealth's evaluation and the possible uses of the mental health information gathered. While Savino argues that he deserved specific notice that his evaluation could be used to establish future

16

dangerousness, Smith and its progeny do not require such specific notice. In Woomer v. Aiken, 856 F.2d 677, 681-82 (4th Cir. 1988), cert. denied, 489 U.S. 1091 (1989), we applied Buchanan to reject a nearly identical claim. There, we found no Fifth or Sixth Amendment violation because defense counsel had requested one mental health evaluation and consented to the other, and thus had actual notice of the examinations. Id. at 682. We further concluded that the Constitution does not require that a defendant be specifically notified that a psychiatric evaluation might provide a basis for a future dangerousness argument. Id. Given that the facts before us are nearly identical to those in Woomer, we reach the same result.

Finally, Va. Code Ann. § 19.2-264.3:1 differentiates between a defendant's statements made during psychiatric evaluation and an expert's opinion based upon such statements. The statute forbids the use of statements or disclosures made by the defendant during a capital sentencing evaluation as evidence against the defendant for the purpose of proving aggravating circumstances, but it allows the use of those statements or disclosures in rebuttal to issues raised by the defense in mitigation. Va. Code Ann. § 19.2-264.3:1(F) & (G). Because the statute does not preclude use of the opinion of the Commonwealth's examiner for establishing an aggravating circumstance, however, the Virginia Supreme Court has determined that its provisions permit the expert's opinions on future dangerousness. Stewart v. Virginia, 427 S.E.2d 394, 407-08 (Va.), cert. denied, 114 S.Ct. 143 (1993); Edmonds v. Virginia 329 S.E.2d 807, 813 (Va.), cert. denied, 474 U.S. 975 (1985); see also Barefoot v. Estelle, 463 U.S. 880, 896-903 (1983) (holding espert psychiatric testimony admissible on issue of predicting furture dangerousness). Not only are we bound by decisions of state courts on state questions when we sit in habeas review, Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), but we find the interpretation consistent with the constitutional standards set forth in Buchanan, 483 U.S. at 410-11. We further conclude that Dr. Centor's testimony abides by these rules and principles.

At sentencing, the Commonwealth's expert did not disclose any statement that Savino made during his evaluation. Dr. Centor merely rendered an opinion as to Savino's future dangerousness. The doctor testified that he based his opinion on evidence other than Savino's statements to him, naming three factors that he considered--Savino's

17

past criminal history, the nature of the crime, and Savino's history of substance abuse. Upon cross-examination by the Commonwealth, however, the defense expert read aloud a fourth factor from Dr. Centor's report: Savino's "stated conviction from an early age that he'll die before his time and therefore there's no use in trying to make anything out of himself." Dr. Hovermale read the statement of her own accord.

Even if the testimony constituted error, it was harmless. Under Virginia law, the circumstances of the criminal offense in and of themselves may constitute sufficient evidence of future dangerousness. Va. Code Ann. § 19.2-264.4(C); Delong v. Virginia, 362 S.E.2d 669, 677 (Va. 1987), cert. denied, 485 U.S. 929 (1988). At sentencing, the Commonwealth presented compelling evidence of Savino's prior criminal record and his own statements of his criminal history. The nature of the crime and the circumstances surrounding it certainly revealed viciousness and dangerousness. Dr. Centor presented his opinion that Savino represented a future danger, but he specified that his opinion was based on Savino's criminal history and drug addiction, as well as the nature of the crime. In addition to Savino's statements during the evaluation, Dr. Centor said he reviewed numerous outside materials.[10] Excluding Savino's statements, therefore, would probably have had little if any impact on Dr. Centor's assessment. Moreover, Dr. Centor never mentioned his interview with Savino upon direct examination; he did so on only upon questioning by the defense. Thus, the alleged error cannot be said to have had a "substantial and injurious effect or influence in determining the[ ] verdict." Brecht v. Abrahamson, 113 S.Ct. 1710, 1713 (1993).

Consequently, we find that Savino's constitutional rights were not violated by Dr. Centor's testimony regarding future dangerousness.

_____

[10] Dr. Centor said he reviewed police reports, Savino's statements to police, FBI reports of previous convictions and sentences, the medical examiner's report, Dr. Hovermale's report, copies of twenty-six warrants for Savino's arrest, and photographs of the crime scene.

18

III.

For the foregoing reasons, the district court's order denying <u>habeas</u> relief is

<u>AFFIRMED</u>.

19