Rehearing en banc granted by order
filed 3/26/99; published opinion filed
1/20/99 is vacated.

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 96-7539
(CA-95-237)

Irving Houston Hawkins,

Petitioner - Appellant,

versus

Franklin Freeman, etc., et al,

Respondents - Appellees.

O R D E R

The court amends its opinion filed January 20, 1999, as follows:

On page 35, second full paragraph, line 5 -- the word "objections" is corrected to read "object<u>ives</u>."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

IRVING HOUSTON HAWKINS,
<u>Petitioner-Appellant,</u>

v.

FRANKLIN FREEMAN, Secretary for the

North Carolina Department of
Correction; J. V. TURLINGTON,
Superintendent, Pender Correctional
Institute,
<u>Respondents-Appellees.</u>

No. 96-7539

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
Richard C. Erwin, Senior District Judge.
(CA-95-237)

Argued: June 3, 1998

Decided: January 20, 1999

Before MURNAGHAN and ERVIN, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Reversed and remanded with instructions to grant the petition by pub-
lished opinion. Judge Murnaghan wrote the opinion, in which Judge
Ervin joined. Senior Judge Phillips wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Kelly M. Baldrate, Third Year Law Student, UNIVER-
SITY OF VIRGINIA SCHOOL OF LAW APPELLATE LITIGA-

TION CLINIC, Charlottesville, Virginia, for Appellant. Clarence Joe DelForge, III, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Neal L. Walters, James D. Jones, Third Year Law Student, UNIVERSITY OF VIRGINIA SCHOOL OF LAW APPELLATE LITIGATION CLINIC, Charlottesville, Virginia, for Appellant. Michael F. Easley, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

_____

## OPINION

MURNAGHAN, Circuit Judge:

In 1981, Irving Hawkins was sentenced to fifty years of imprisonment in North Carolina as a habitual felon. After receiving contradictory notifications about when he would be eligible for parole, he was finally paroled in 1992. Hawkins successfully reintegrated into the community, obeying all conditions of his parole, holding a job in which he was promoted, and reacquainting himself with his family. Then in 1994 he was rearrested on the basis that the determination that he was eligible for parole had been made in error.

Having exhausted his state appeals, Hawkins petitioned for habeas corpus relief. He argues primarily that his reincarceration violates the Fourteenth Amendment's guarantee of substantive due process. We hold that, where the parolee did not know that his release was in error, his interest in his continued liberty crystallized during the two years of successful parole and the Fourteenth Amendment requires that we strictly scrutinize the State's intentional infringement of that interest.

I.

The facts in this case are essentially agreed upon: the State does not contest Hawkins's "apparent good-conduct while released," and Hawkins concedes that, although he did not realize it at the time, he was statutorily ineligible when he was paroled.**1** We begin with a short review of how Hawkins came to be arrested, paroled and rearrested.

_____

**1** We expressed some concern at oral argument about how the evidence about Hawkins's rehabilitation had gotten into the record, as it appeared

2

On February 27, 1981, Irving Hawkins was convicted in Guilford County, North Carolina, of possession, sale and delivery of one-half gram of cocaine. Hawkins was found to be a habitual felon and sentenced to fifty years of imprisonment on the sale and delivery charge and ten years concurrently on the possession charges (along with sixty days concurrently on a charge of driving under the influence). It must be admitted that Hawkins is not a sympathetic character. The habitual felon determination was based on evidence that Hawkins had as a young man been convicted of and imprisoned for one count of rape, two counts of aggravated assault with intent to commit rape and one count of armed robbery. See State v. Simmons, 286 S.E.2d 898, 900 (Ct. App. N.C. 1982). His FBI record reveals other less serious charges as well, both as an adult and as a minor.

From the beginning of his incarceration as a habitual felon, Hawkins was given conflicting explanations of when he would be eligible for parole. The record suggests that, at first, he may have been told that he would be eligible for parole very shortly after his conviction. Then, on June 14, 1982, the Parole Commission informed Hawkins that he would not be eligible for parole until he had "served 30 years" of his sentence, giving him a parole eligibility date of "October 20, 2010." The Commission assured Hawkins it had "studied all the facts in your case, and we are sure that we are following the requirement of the law" in reaching this 2010 date. About a year later, on September 7, 1983, the Parole Commission changed its mind once again: "After carefully checking your parole eligibility date, we find that you will not be eligible for parole until April 20, 2018." Finally, on March 13, 1992, Hawkins was suddenly informed that he was being consid-

_____

to have been based on the Parole Commission's report of the parole revocation hearing rather than on state court findings of fact or a federal court evidentiary hearing. Because there are no state court findings of fact to presume correct, we would typically assume the truth of Hawkins's attestations for purposes of deciding the appeal from summary judgment, see Turner v. Jabe, 58 F.3d 924, 930 n.6 (4th Cir. 1995), and would remand to the district court to hold an evidentiary hearing if those facts established that Hawkins was entitled to relief. However, the State assured us that it did not contest the facts put forth by Hawkins, and that no remand for further fact-finding was necessary.

3

ered for community service parole. Assuring Hawkins that it had "made a careful investigation of this case," the Parole Commission paroled Hawkins on July 6, 1992.

Hawkins claims to have been completely rehabilitated during his eleven years of imprisonment. The magistrate judge who first heard this habeas petition found that Hawkins had a good prison record during those years and, while incarcerated, obtained a business degree from Shaw University through a study-release program. The magistrate judge further found that during Hawkins's nearly two years on parole he substantially complied with his parole obligations, held a steady job in which he was promoted, and reestablished ties with his family. Although there is some indication that Hawkins did not complete the community service that he was assigned, the Parole Commission reported that "Hawkins had no problems while on parole," and the State does not contest Hawkins's statement in his affidavit that during his release he "never violated [his] parole."

Then, on March 25, 1994, Hawkins was rearrested on the basis that he had not been eligible for parole in 1992. The Parole Commission concluded that the habitual felon statute under which Hawkins was sentenced, N.C. Gen. Stat. § 14-7.6, required that he serve 75% of his 50-year sentence (37.5 years) before he would be eligible for parole. Ironically, that statute had been repealed effective only four months after Hawkins's sentencing and replaced with a requirement that a habitual offender serve "not less than seven years." By letter of October 10, 1994, the Commission informed the reincarcerated Hawkins that his "current parole eligibility date" would be April 20, 2018.

Hawkins challenged his reincarceration on various grounds. Having effectively exhausted his claims in state court, [2] Hawkins on January 27, 1995, petitioned for habeas corpus relief. His claim therefore is subject to the pre-Antiterrorism and Effective Death Penalty Act standards. See Lindh v. Murphy, 117 S. Ct. 2059, 2063 (1997). A magistrate judge recommended that such relief be denied, and the district judge agreed with that recommendation, granting summary judgment to the State. Hawkins appeals to us.

_____

[2] The State has waived the exhaustion requirement for Hawkins's main claim of a substantive due process violation.

4

II.

We review the district court's grant of summary judgment to the State de novo. See Savino v. Murray, 82 F.3d 593, 598 (4th Cir. 1996). Hawkins argues primarily that his reincarceration violated his substantive due process rights, and advances alternative theories of waiver, estoppel and the bar against installment sentences. He also argues that his parole revocation hearing did not contain all of the procedural protections he was due. Because we believe that the established principles of the substantive component of the Fourteenth Amendment's Due Process Clause govern the case, we begin with an exposition of those principles.

A.

The Due Process Clause of the Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least [111] years, since Mugler v. Kansas, 123 U.S. 623, 660-661 (1887), the Clause has been understood to contain a substantive component as well, one `barring certain government actions regardless of the fairness of the procedures used to implement them.'" Planned Parenthood v. Casey, 505 U.S. 833, 846 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). Through the doctrine of substantive due process, "all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States." Whitney v. California, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring), quoted in Planned Parenthood, 505 U.S. at 847.

It is contested whether the asserted interest infringed by Hawkins's reincarceration is such a fundamental liberty right. The Supreme Court has "regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition' and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Washington v. Glucksberg, 117 S. Ct. 2258, 2268 (1997) (quoting Moore v. City of East Cleveland,

5

431 U.S. 494, 503 (1977) (plurality opinion), Palko v. Connecticut, 302 U.S. 319, 325 (1937), and id. at 326) (citations omitted). Certain liberties enshrined in the Bill of Rights offer the clearest examples of those held to be "fundamental," but the category is not limited to this list, nor is it limited to "those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified." Planned Parenthood, 505 U.S. at 847. Instead, the "full scope of the liberty guaranteed by the Due Process Clause" comprises "a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment." Poe v. Ullman, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds) (citations omitted), quoted in Planned Parenthood, 505 U.S. at 848-49.

But substantive due process does not absolutely guarantee that these fundamental rights will be held inviolate. Executive action that infringes such a right violates the substantive component of the Due Process Clause "only when it `can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" County of Sacramento v. Lewis, 118 S. Ct. 1708, 1717 & n.8 (1998) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992)). In the past, the Supreme Court has described the substantive due process doctrine as if it provided two independent types of protection: "So-called `substantive due process' prevents the government from engaging in conduct that `shocks the conscience' or interferes with rights `implicit in the concept of ordered liberty.'" United States v. Salerno, 481 U.S. 739, 746 (1987) (quoting Rochin v. California, 342 U.S. 165, 172 (1952), and Palko, 302 U.S. at 325-26) (citations omitted) (emphasis added). However, the Court's most recent foray into the realm characterizes the determination "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" as a "threshold question," "antecedent to" any "possibility of recognizing a substantive due process right to be free of such executive action." County of Sacramento, 118 S. Ct. at 1717 n.8. Therefore, not unless executive action "shocks the conscience" does it reach the level of abuse of

6

power necessary to invoke substantive due process protections for life, liberty or property. Id. at 1717 & n.8.

Negligently inflicted harm, the basis of traditional tort liability, is not sufficiently conscience-shocking as to implicate constitutional Due Process Clause protections, whether substantive or procedural. See id. at 1718 (citing Davidson v. Cannon , 474 U.S. 344, 348 (1986)). "Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but `less than intentional conduct, such as recklessness or "gross negligence,"' is a matter for closer calls." Id. (quoting Daniels, 474 U.S. at 334 n.3) (citations omitted). That is, "deliberately indifferent [official] conduct [is] enough to satisfy the fault requirement for due process claims" in certain circumstances, id. (giving as an example a state's deliberate indifference to the medical needs of its prisoners, in violation of the Eighth Amendment), although in other circumstances such "[d]eliberate indifference . . . may not be so patently egregious" as to constitute a conscience-shocking abuse of power, id. at 1718-19 (explaining that deliberate indifference to life is "less egregious" in the context of a high-speed law enforcement chase). Rather than negligence, recklessness or deliberate indifference, it has traditionally been intentional actions, those "deliberate decisions of government officials to deprive a person of life, liberty, or property," about which the substantive component of the Due Process Clause is concerned. Daniels, 474 U.S. at 331, quoted in County of Sacramento, 118 S. Ct. at 1718. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." County of Sacramento, 118 S. Ct. at 1718.

B.

Applying these principles to Hawkins's case, our task is to determine whether the agreed-upon facts demonstrate that the State has intentionally violated a fundamental liberty interest, or has been deliberately indifferent to such an interest to an extent that shocks the conscience. If so, the State's actions must be subjected to strict scrutiny. "[T]he Fourteenth Amendment `forbids the government to infringe . . . "fundamental" liberty interests at all, no matter what process is

7

provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" Glucksberg, 117 S. Ct. at 2268 (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)) (ellipsis in original); Herndon v. Chapel Hill-Carborro City Bd. of Educ., 89 F.3d 174, 177 (4th Cir. 1996), cert. denied, 117 S. Ct. 949 (1997).

1.

The "threshold question" whether the behavior of the Parole Commission was sufficiently conscience-shocking as to implicate substantive due process protections at all is not at issue in this case, because the State acted intentionally to deprive Hawkins of his liberty. If the liberty interest that Hawkins asserts is a fundamental one protected by the Due Process Clause, then its deliberate violation by the State, unless narrowly tailored to serve a compelling interest, is an arbitrary abuse of power sufficient to shock the judicial conscience. See County of Sacramento, 118 S. Ct. at 1717-18. It need not have been the specific intent of the State to harm the individual, so long as the State acted "with full appreciation" of the effect of its action. Id. at 1718 n.9. To state it more simply, the "fundamental rights" protected by substantive due process are those "`implicit in the concept of ordered liberty' such that `neither liberty nor justice would exist if they were sacrificed.'" Glucksberg, 117 S. Ct. at 2268 (quoting Palko, 302 U.S. at 325, 326, 58 S. Ct. at 152). What kind of society would this be were we to condone any intentional infringement of fundamental rights so defined?

2.

This case therefore turns on whether the liberty interest asserted by Hawkins to prevent his reincarceration is a "fundamental" one. Whether a fundamental liberty interest exists is of course a legal determination, subject to de novo review. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997). The Supreme Court has required a "careful description" of the asserted interest, Glucksberg, 117 S. Ct. at 2268, recognizing its "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," Collins, 503 U.S. at 125, quoted in Glucksberg, 117 S. Ct. at 2267. Such a liberty interest may be created by state law or by the Due Process Clause

8

itself, see e.g., Washington v. Harper, 494 U.S. 210, 221-22 (1990) ("We have no doubt that, in addition to the liberty interest created by the State's Policy, respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."), but judicial restraint requires us to "exercise the utmost care whenever we are asked to break new ground in this field," Collins, 503 U.S. at 125.

a.

Luckily, Hawkins does not ask us to break new ground here: the liberty interest that he asserts has already been recognized as a fundamental one, to which substantive due process protections attach, in two Fourth Circuit opinions as well as by a number of our sister circuits. A parolee's interest in his continued liberty during good behavior is protected by the substantive due process right to the finality of his sentence. The Fourth Circuit has recognized this fundamental right in two contexts, in the cases of United States v. Lundien, 769 F.2d 981 (4th Cir. 1985), and United States v. Cook, 890 F.2d 672 (4th Cir. 1989). Each of these cases advances the proposition that it is fundamentally unfair and violates the guarantee of due process for a court to increase a sentence, even where correcting an unlawful sentence, once the defendant has served so much of the original sentence that "his expectations as to its finality have crystallized." Lundien, 769 F.2d at 987; Cook, 890 F.2d at 675.**3**

In Lundien, the district court initially sentenced the defendant to a term of ten years on each of two counts, to be served concurrently, but five days later amended the sentence by increasing it to twenty years on one of the counts. See 769 F.2d at 982. The defendant challenged the amendment. After explaining that the Double Jeopardy Clause did not address the situation, the Fourth Circuit observed that it "seems more likely that any constitutional source for protection of

_____

**3** Lundien and Cook's recognition of a sentencing court's inherent authority to correct an erroneous sentence has been superseded by Fed. R. Crim P. 35(c), which "in effect codifies the result in [Cook and a similar Second Circuit case] but provides a more stringent time requirement." Fed. R. Crim. P. 35 advisory committee notes, 1991 amendment.

the defendant's interest in the finality of his sentence must be found in the fifth amendment's guarantee of due process." Id. at 986.**4**

The Circuit observed that the exact parameters of the guarantee of due process in this context were "not firmly fixed." Id. at 987. However, it set forth the following principle, which applies to Hawkins's case as well:

> [D]ue process may also be denied when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them. As the First Circuit has stated the principle:

> [T]he power of a sentencing court to correct <u>even a statutorily invalid sentence</u> must be subject to some temporal limit. When a prisoner first commences to serve his sentence, especially if it involves a long prison term as here, the prospect of release on parole or otherwise may seem but a dimly perceived, largely unreal hope. As the months and years pass, however, the date of that prospect must assume a real and psychologically critical importance. The prisoner may be aided in enduring his confinement and coping with the prison regime by the knowledge that with good behavior release on parole or release outright will be achieved on a date certain. <u>After a substantial period of time, therefore, it might be fundamentally unfair, and thus violative of due process for a court to alter even an illegal sentence in a way which frustrates a prisoner's expectations by postponing his parole eligibility or release date far beyond that originally set.</u>

_____

**4** Although <u>Lundien</u> examined substantive due process protections under the Fifth Amendment, the same analysis applies to the Fourteenth Amendment, "given the Supreme Court's essentially identical interpretations of the concept [of "liberty"] under the two amendments." <u>Piechowicz v. United States</u>, 885 F.2d 1207, 1214 n.9 (4th Cir. 1989).

10

Id. (quoting Breest v. Helgemoe, 579 F.2d 95, 101 (1st Cir. 1978)) (emphasis added) (second alteration in original); see also United States v. Smith, 115 F.3d 241, 248 (4th Cir.) (recognizing in passing the rule of Lundien that due process may be denied if a sentence is enhanced after a defendant's expectation of its finality has crystallized), cert. denied, 118 S. Ct. 315 (1997).

The expectation of finality of sentence that arises merely from being given a parole date is much stronger in Hawkins's case, where the defendant has actually been paroled, has no knowledge that his parole was in error, has made the difficult transition from prisoner to rehabilitated citizen, and has become a productive member of society. Once the defendant has been released on parole and has successfully reintegrated into society for a period of years, "his expectations as to [the] finality [of his release on parole] have crystallized and it would be fundamentally unfair to defeat them." Lundien, 769 F.2d at 987.

The question arises, how long does it take for such an expectation to "crystallize?" In Lundien, the Fourth Circuit held that where the defendant "had served only five days of an expected sentence of ten years and he had not even reached his final prison destination," his expectations had not sufficiently "crystallized." Id. Breest, on which Lundien relied, held that 14 days was not long enough. See 579 F.2d at 98-101. Hawkins, however, was on parole for almost two years. Certainly his expectation of the finality of his parole determination crystallized within that time.

The Fourth Circuit reaffirmed the principle announced in Lundien in the case of United States v. Cook, 890 F.2d 672 (4th Cir. 1989). There the Circuit recognized a court's inherent power to correct a mistaken sentence. In doing so, it explained:

> This inherent power is not without limitation, for at some point every sentence must become final. As we indicated in United States v. Lundien, 769 F.2d 981 (4th Cir. 1985), it would be fundamentally unfair and a violation of due process to allow a district court to enhance a sentence "after the defendant has served so much of his sentence that his expectations as to its finality have crystallized."

11

Id. at 675 (quoting Lundien, 769 F.2d at 987) (part of citation omitted). The Circuit therefore held that the power to correct "an acknowledged and obvious mistake" in sentencing "exists only during that period of time in which either party may file a notice of appeal. After that time, we believe that the sentence has become final, and the district court lacks any authority to modify it." Id. If the Due Process Clause limits a court's power to correct a mistake in sentencing to only the 30 days in which an appeal may be taken, because after 30 days an inmate's interest in the finality of his sentence has crystallized, then clearly the Parole Commission may not correct a mistake in its parole calculations two years after the defendant has been released without violating the same guarantee of due process.

Other Circuits and district courts have held that in certain circumstances it would be inconsistent with the fundamental principles of liberty and justice protected by the Due Process Clause to allow a state to reincarcerate an erroneously released prisoner after he has made a good adjustment to society. See, e.g., DeWitt v. Ventetoulo, 6 F.3d 32, 34-35 (1st Cir. 1993); Johnson v. Williford, 682 F.2d 868, 873 (9th Cir. 1982); United States v. Merritt, 478 F. Supp. 804, 807-08 (D.D.C. 1979); Lanier v. Williams, 361 F. Supp. 944, 947 (E.D.N.C. 1973). An instructive example is offered by the case of DeWitt v. Ventetoulo, 6 F.3d 32 (1st Cir. 1993).

DeWitt had been sentenced to life imprisonment after conviction of a particularly evil assault with intent to murder. While serving his sentence, DeWitt came to the aid of a prison guard who was being attacked by an inmate and later testified for the state in the prosecution of the inmate. In recognition of these efforts, the trial court suspended all but 15 years of DeWitt's life sentence. See id. at 33.

Two years later, the state supreme court held in a separate case that a trial court could not suspend such a sentence once a defendant had begun to serve it. Nevertheless, the state made no effort to undo the suspension of DeWitt's sentence. Six years after his sentence had been partially suspended, DeWitt was granted parole and released from prison. Had DeWitt's sentence not been suspended, he would not have been eligible for parole for another 16 months. See id.

After his parole, DeWitt obtained work and reestablished contact with his family. However, eight months after his release he was

12

involved in an altercation for which he was arrested. Instead of seeking to revoke his parole, the state vacated its earlier order that had suspended in part his life sentence. DeWitt was recommitted to serve the remainder of the term of life imprisonment. See id.

Reserving the question whether DeWitt had violated the conditions of his parole, the First Circuit held that due process notions of fundamental fairness prohibited the state from reimposing DeWitt's original life term. See id. at 35-36. Citing the Fourth Circuit's decision in Lundien, the First Circuit explained that only in extreme cases would a court's correction of an earlier mistake in sentencing be "so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause." Id. at 35. Without establishing any specific tests, the First Circuit proposed certain factors to which consideration should be given:

> to the lapse of time between the mistake and the attempted increase in the sentence, to whether or not the defendant contributed to the mistake and the reasonableness of his intervening expectations, to the prejudice worked by a later change, and to the diligence exercised by the state in seeking the change.

Id.

In finding that DeWitt's rearrest was fundamentally unfair, the First Circuit stressed that the state with due diligence could have challenged the suspension of his sentence far sooner than it did. See id. It also noted that DeWitt not only was led reasonably to believe that his sentence had been reduced for a number of years while in prison, but he was actually released, set down new roots in society, got a job and reestablished family ties. See id. Finally, the First Circuit noted that the state's interest in rearresting DeWitt and correcting its earlier mistake was weak: it seemed to be an attempt to avoid granting DeWitt the full hearing necessary to revoke his parole. See id. at 35-36.

The First Circuit's opinion in DeWitt supports our conclusion in Hawkins's case. In explaining that its rule was a narrow one, the First Circuit described the numerous cases which have allowed a sentence

13

to be increased after it was initially imposed in error. Each of these cases was distinguished from DeWitt's:

> In virtually all [such cases] that we have discovered, there has been some distinguishing circumstance that separates that case from DeWitt's, for example, because (as is often true) the defendant was still in prison, or the interval between the original sentence and its correction was brief, or because the defendant almost certainly knew or should have known that an error had been made.

Id. at 36. None of those circumstances distinguish DeWitt's case from Hawkins's, however: Hawkins was released from prison, the interval between his release and its correction was almost two years, and he did not know that his parole eligibility determination was erroneous. The First Circuit in DeWitt followed the statement in Lundien "that due process must in principle impose an outer limit on the ability to correct a sentence after the event." Id. We do the same.

b.

The State seeks to avoid the principle of Lundien and Cook on three grounds. First, the State attempts to distinguish the two cases by arguing that, unlike Lundien and Cook, Hawkins's sentence was not "enhanced" by the Parole Commission. That in those cases a mistaken sentence was increased, whereas in Hawkins's case his erroneously granted parole was revoked, is a distinction without a difference. In the case where a sentence being served is increased, making the parole date farther away, the inmate's reasonable and significant expectation of future liberty has been frustrated, implicating the protection of the Due Process Clause. The frustration is the same, if not magnified, where, the parole date having passed and the inmate having been released, parole is unexpectedly revoked and the inmate is returned to prison, without any fault of his own, to continue serving a sentence. In both cases the inmate has an interest in the finality of the sentence imposed upon him by the state, including his date of eligibility for parole. See Lundien, 769 F.2d at 987. Once that interest crystallizes, the substantive guarantees of the Due Process Clause prevent the state from infringing it.

14

Second, the State tries to distinguish <u>Lundien</u> and <u>Cook</u> by arguing that Hawkins had no "reasonable expectation" of remaining on parole release because he had been "on notice at least since 1982 he had to serve 30 years before [he would be] eligible for parole." <u>See Green v. Christiansen</u>, 732 F.2d 1397, 1399 (9th Cir. 1984) (refusing to estop the government from reincarcerating an erroneously released prisoner who had not been so misled as to form a reasonable expectation of release, and who was therefore charged with constructive knowledge that he still had time to serve). This is the State's key argument: that Hawkins knew from letters he received from the parole commission that he had at least 30 more years to serve before he would be eligible for parole, and therefore he had actual or constructive notice that his parole was in error. The State repeats this argument, almost word-for-word, no fewer than fourteen separate times in its brief.

Despite the State's insistent repetition, the argument is meritless. The State misrepresents the record when it claims that Hawkins was "advised at the beginning of his sentence in 1982 and again in 1983 that he would not be eligible for parole until he served more than 30 years of his sentence." In fact, the letters to which the State refers <u>contradicted</u> each other, setting parole eligibility dates that were <u>eight years</u> apart. Throughout his sentence, Hawkins was notified of as many as four different dates on which he would be eligible for parole. First, there is evidence that he was told that he would be eligible for parole quite shortly after his imprisonment; second, the Parole Commission sent a letter to correct that earlier information, explaining that they were now "sure," after "stud[ying] all the facts" in his case, that he would be eligible for parole in 2010; third, he was told that after "carefully checking," the Parole Commission found he would not be eligible for parole until 2018; and fourth he was told the Parole Commission had decided after "careful investigation" that he <u>was</u> eligible for parole (and was in fact paroled) in 1992. The Parole Commission had repeatedly revised its conclusion about when he would be eligible for parole, and three times those conflicting revisions were accompanied by assurances that, this time, the Commission had been "careful[ ]" and was "sure." When Hawkins received the fourth revision, indicating that he was in fact eligible for parole, he had no reason to believe that any of the earlier notices were more accurate.

15

From Hawkins's perspective, the earlier parole eligibility calculations were superseded by the latest one. And the fact that he was <u>actually</u> paroled confirmed to him that the most recent letter was accurate. Finally, after almost two years on parole during which he was supervised by a North Carolina state-government parole officer, he must reasonably have had every confidence that he had put his days in prison behind him.

It is important to note that while the State argues that Hawkins had <u>notice</u> that his parole was in error, it does not claim that he had actual <u>knowledge</u> of the error. Hawkins stated in his affidavit: "I was not aware at any time prior to [the date of parole] that I was not eligible for parole when I was, in fact, paroled, nor was I aware that the parole commission made a mistake when paroling me until my arrest in March, 1994." The State does not contest this assertion. The petitioner's lack of actual knowledge that his release was in error is what distinguishes Hawkins's case from cases such as <u>Camper v. Norris</u>, 36 F.3d 782, 784-85 (8th Cir. 1994) (finding no due process violation where the defendant knew his continued release was in error), and <u>United States v. Martinez</u>, 837 F.2d 861, 864-65 (9th Cir. 1988) (holding that incarceration after a delay of many years did not violate the due process guarantees of the Fifth Amendment where the defendant knew that a mistake had been made).

However, the State maintains that Hawkins should be <u>presumed</u> to have known that he was ineligible for parole. After all, it is a truism that all citizens are presumed to know the law. <u>See, e.g.</u>, <u>Jacobson v. United States</u>, 503 U.S. 540, 550 (1992); <u>United States v. Aquino-Chacon</u>, 109 F.3d 936, 938 (4th Cir.), <u>cert. denied</u>, 118 S. Ct. 335 (1997). Given this presumption, the State argues that "[n]o person obtains a right to incorrect application of a statute," citing <u>Lustgarden v. Gunter</u>, 779 F. Supp. 500, 506 (D. Colo. 1991), <u>aff'd</u>, 966 F.2d 552 (10th Cir. 1992). If the State's argument is correct, then a defendant cannot have a fundamental liberty interest in the finality of a sentence that is contrary to law.

But both <u>Lundien</u> and <u>Cook</u> foreclose the argument in this context. In <u>Cook</u>, the Fourth Circuit recognized that "at some point <u>every</u> <u>sentence</u> must become final." 890 F.2d at 675 (emphasis added). We affirmed that it would be "fundamentally unfair and a violation of due

16

process to allow a district court to enhance a sentence" once it had crystallized, even where the original sentence was the result of "an acknowledged misinterpretation of the pertinent[sentencing] guidelines section." Id. We then applied that rule to a sentence that "was not authorized by [the pertinent sentencing guidelines] section nor based on a departure from the guidelines," in short, a "sentence [that] was not a lawful one." Id. We made no contention that the defendant's interest in the finality of his unlawful sentence was illegitimate because he should be presumed to know the law. By contrast, we held that the district court had the power to correct the sentence only "[b]ecause the time for the government to file a notice of appeal had not expired," and the sentence had therefore not become "final." Id.

Lundien also explicitly rejected the argument that the Due Process Clause does not afford an interest in a statutorily invalid sentence. Those words, quoted above, bear repeating:

> [T]he power of a sentencing court to correct even a statutorily invalid sentence must be subject to some temporal limit. . . . After a substantial period of time, therefore, it might be fundamentally unfair, and thus violative of due process for a court to alter even an illegal sentence in a way which frustrates a prisoner's expectations by postponing his parole eligibility or release date far beyond that originally set.

769 F.2d at 987 (quoting Breest, 579 F.2d at 101) (internal quotation marks omitted) (alteration in original) (emphasis added).

The rule that all persons must be presumed to know the law certainly applies where an individual takes actions that violate the law, but claims that he was ignorant of the law's proscription. That presumption is a reflection of the principle that ignorance of the law is no excuse for its violation. But the presumption is inapposite in this sentencing context -- here, the prisoner is entitled to expect that the sentence that he is given will be final, and after a period of time his expectation crystallizes. We do not require a prisoner independently to analyze the sentencing guidelines and their interactions with the parole eligibility rules to determine for himself whether the sentencing judge's or Parole Commission's decisions are correct. The tangle

17

of repealed and amended, interdependent sentencing and probation provisions in North Carolina has caused confusion for its Parole Commission and Attorney General before, see generally Glenn v. Johnson, 761 F.2d 192 (4th Cir. 1985), and we very much doubt that Hawkins, without any legal training, could be expected to untangle them.

The State's third attempt to avoid the rule of Lundien and Cook is by citing two cases, Glenn v. Johnson, 761 F.2d 192 (4th Cir. 1985), and Crowley v. Landon, 780 F.2d 440 (4th Cir. 1985), which, it claims, stand for the proposition that "the state's interest in correctly enforcing its laws can outweigh a prisoner's settled expectation of continued release on erroneous parole." But these cases simply do not address the due process claim made by Hawkins.

In Glenn v. Johnson, the Fourth Circuit addressed the proper interpretation of a North Carolina parole eligibility statute. The Parole Commission believed that Glenn and other similarly situated prisoners would be eligible for parole after serving ten years of their sentence; the state Attorney General believed otherwise. See 761 F.2d at 193-94. A class of such prisoners litigated the issue, and the Fourth Circuit concluded that the Parole Commission's interpretation was in error. See id. at 194-95.

However, the opinion did not resolve whether the Due Process Clause would be implicated if Glenn had been informed at first of the earlier parole date and then, after his expectations of parole crystallized, told that the later date was correct. In fact, the Fourth Circuit specifically declined to address "considerations of alleged due process . . . infractions," explaining that "[t]hose questions, while fascinating, need not long engage us" because the Circuit found that the statute had "inescapabl[y]" prescribed the proper parole date all along. Id.

The State asserts that "Glenn stands for the proposition that the Parole Commission has, and indeed must have, authority to correct error in determining parole eligibility even when the correction upsets a prisoner's settled expectation of earlier release." However, despite the State's claim, there is no indication in the Glenn opinion that the prisoner had been led to rely on, or even informed of, the erroneous, early parole eligibility date and then later been told that another date was correct. Because Glenn specifically declined to address any due

18

process considerations it is not controlling in our case, and certainly it cannot counter the rule of Lundien and Cook.

The State also relies upon Crowley v. Landon, in which the Fourth Circuit addressed the case of three inmates whose sentences had been suspended and who had been released on supervised probation by a Virginia trial court. Following unfavorable publicity, the Virginia attorney general petitioned the Supreme Court of Virginia for a writ to bar the inmate's release. Eventually, the Supreme Court of Virginia reversed the trial court and vacated the release orders. The inmates voluntarily surrendered and were reincarcerated. See 780 F.2d at 442.

The inmates petitioned for habeas corpus relief from their reincarceration. Although their situation posed similar due process concerns as does Hawkins's case, the Crowley petitioners did not argue that reincarceration violated their substantive due process rights. Rather, they made only the following four arguments:

> The petitioners' habeas petition attacks their reincarceration on the grounds that: 1) it deprived them of equal protection under the fourteenth amendment of the United States Constitution [because other released prisoners were not reincarcerated]; 2) they have a due process right to good time credit towards parole for the time spent on probation; 3) their reincarceration violated the constitutional protection against ex post facto laws; and, 4) their reincarceration subjected them to cruel and unusual punishment.

Id.

The Fourth Circuit denied each of these four asserted bases for habeas relief.[5] The State is wrong, therefore, when it asserts that

_____

[5] The closest Crowley came to addressing whether an erroneously released defendant had any protections against rearrest was when it cited United States v. Merritt, 478 F. Supp. 804, 807 (D.D.C. 1979), in a footnote to the portion of the opinion denying good time credit toward parole for the months the petitioners had spent on release. See 780 F.2d at 444 n.6. The Fourth Circuit explicitly declined to decide whether to adopt

19

"Crowley stands for the proposition that the state may reincarcerate one group of prisoners who were erroneously released while choosing not to pursue others without violating due process or equal protection." The court in Crowley was not presented with and did not answer the due process question posed in our case.

In sum, Fourth Circuit law provides that after an inmate is sentenced, his reasonable expectation of future release on a specific date crystallizes over time. Once crystallized, that reasonable expectation of freedom is a legitimate liberty interest protected by the Due Process Clause. When Hawkins was released on parole and reintegrated himself into the community, he reasonably expected to continue to live as a free citizen so long as he obeyed the conditions of his parole. During the two years in which he was on parole without violation, that interest crystallized. When the state rearrested Hawkins to correct its two-year-old error, it violated his right to due process of law.**6**

_____

Merritt's conclusion that three factors would have to be present to warrant habeas relief:

> The erroneous release must not have been attributable to the petitioner, the action of the authorities must have amounted to more than simple neglect, and reincarceration must be unequivocally inconsistent with fundamental principles of liberty and justice.

Id. The Fourth Circuit merely noted that the Crowley petitioners' case fell "far short" of meeting Merritt's requirements. Id. In Merritt, the petitioner had been released on parole for nearly three years before his rearrest on an outstanding detainer, and he had previously unsuccessfully sought to clarify the status of the detainer; in Crowley, the three petitioners had been out of prison for only seven, six and two months, during which their release orders were being challenged.

**6** It may be argued that Hawkins has not been injured, but rather has received a windfall by his release: after all, if he had been asked up-front whether he would prefer to serve his full sentence uninterrupted or to serve it with a two year period of release in the middle, he would likely have chosen the latter. But it is unjust for the government to parole an inmate and allow him to believe that he may begin his life anew, and then after he has proven himself rehabilitated by holding down a job, reestablishing family ties and integrating successfully in the community for two years, to rearrest him and claim the parole was in error. Hawkins

20

3.

It remains only strictly to scrutinize the State's actions to determine whether its violation of Hawkins's substantive due process right was narrowly tailored to serve a compelling interest. The State has a broad interest in the effective enforcement of its laws, including the correction of its legal errors, so as to guarantee to its citizens a predictable and consistent governance. The State also has an interest in reincarcerating an erroneously released inmate to serve the entirety of his sentence as originally imposed for specific and general deterrent, retributive and rehabilitative reasons. See N.C. Gen. Stat. § 15A-1340.12 ("The primary purposes of sentencing a person convicted of a crime are to impose a punishment commensurate with the injury the offense has caused, taking into account factors that may diminish or increase the offender's culpability; to protect the public by restraining offenders; to assist the offender toward rehabilitation and restoration to the community as a lawful citizen; and to provide a general deterrent to criminal behavior.").

These interests are significantly weakened in Hawkins's case, and his rearrest is not narrowly tailored to serve them. It is far too late for the sentencing provision to be effectively enforced so as to provide a consistent rule of law. The State's interest would have been better served by a competent determination of when Hawkins would be eligible for parole in the first place. The Parole Commission's continually-shifting-yet-continually-confident determinations are not at all well-tailored to the effective enforcement of sentencing provisions.

If there were an allegation that the State had an interest in reincarcerating Hawkins to protect the public safety because Hawkins had not been rehabilitated, that interest would certainly be compelling and

_____

is deeply injured by the fracturing of the family ties he has striven to reestablish, by the interruption of the career he has begun, and by the destruction of the new life he has made for himself, all in reliance, for two years, on the Parole Commission's determination. "Even convicted criminals are entitled to be treated by their government in a fair and straightforward manner." Johnson, 682 F.2d at 872.

21

reincarceration at this late date might be narrowly tailored to remedy the continuing threat to the public. But the State does not assert such an interest, conceding Hawkins's good behavior for the two years he was on parole. The Parole Commission exercised its discretion to parole Hawkins in 1992, noting that he had "made some effort to improve his situation while in prison, via a college degree" and opining that "the best interests of the public and of the inmate will be served by his release under supervision at this time." Since his release he has successfully reintegrated into the community and substantially complied with all parole obligations, vindicating the Parole Commission's judgment that he was a good candidate for parole. There is no evidence nor claim that Hawkins poses any future danger to the community.

The State's interest in general deterrence will not be significantly undermined if Hawkins is allowed to remain on parole. It is inconceivable that any individual who knows that the law proscribes his conduct and that it establishes a particular penalty for violation will be less deterred from breaking the law because he believes that if he is caught, convicted and sentenced the Parole Commission may erroneously parole him too early, and thereafter he will not be rearrested. The rearrest of Hawkins is not narrowly tailored to serve any real interest in general or specific deterrence.

The State's interest in retribution is similarly weak. Hawkins long ago completed his sentences for the crimes that underlay his adjudication as a habitual felon. And the statute that prohibited Hawkins's parole until he had served 75% of his sentence, N.C. Gen. Stat. § 14-7.6, has long since been repealed. Only four months after Hawkins's sentencing, it was replaced with a requirement that such a habitual offender serve at least seven years of his sentence; [7] Hawkins served about eleven years before his parole, and has served four more since his rearrest. His punishment has been more than "commensurate with the injury . . . caused" by his sale and delivery of the half gram of cocaine. Whatever interest the State still has in seeing him punished further is overwhelmed by his crystallized interest in the finality of his parole.

_____

[7] That provision, too, has since been replaced.

22

In fact the State's interest in the rehabilitation of this prisoner is likely to be substantially harmed by his reincarceration for another two decades of imprisonment. He has demonstrated that he can function as a law-abiding and productive member of society. If he is returned to parole, he will still be governed by the threat of reinternment should he violate any parole requirements. But this long reincarceration will likely not improve a rehabilitation that has already been achieved, and may in fact only discourage and embitter him, by teaching that the government cannot be relied upon to treat its citizens fairly.

In sum, North Carolina's two-year-old recognition of its error comes too late. The State's violation of Hawkins's rights guaranteed by the substantive component of the Due Process Clause cannot survive strict scrutiny.

III.

Other courts have examined the due process interests at stake in regards to an erroneously released inmate through the doctrines of estoppel, see, e.g., Green, 732 F.2d at 1397 (refusing to estop the government from rearresting an inmate with constructive knowledge that his release was mistaken); Johnson, 682 F.2d at 871-73 (estopping the government from rearresting an erroneously paroled inmate), of waiver, see, e.g., Camper, 36 F.3d at 784 (finding no waiver where the state's actions were mere negligence, not an affirmative wrong, and where the defendant knew his continued release was in error); Lanier, 361 F. Supp. at 947 (holding that the state had waived its right to rearrest the petitioner where it had led him, through no fault of his own, to believe that he was free of a prison sentence and made no attempt for a number of years to reacquire custody over him), and of the prohibition against the imposition of sentences in installments, see, e.g., Merritt, 478 F. Supp. at 806-08 & n.6 (recognizing "the principle that a prisoner is protected by due process from being required to serve his sentence in installments," and holding that the state's rearrest of an erroneously released prisoner would be inconsistent with fundamental principles of liberty and justice). Hawkins argues that he is entitled to habeas corpus relief on these alternative grounds. Because we find that the substantive guarantees of the Due

23

Process Clause have been violated directly, we do not address the issues of estoppel, waiver or the prohibition of installment sentences.

Hawkins further argues that his reincarceration violated his right to procedural due process because he was not allowed at his parole-revocation hearing to introduce evidence about his "difficult but successful adjustment to civilian life during his time on parole." But Hawkins did have an opportunity, albeit a limited one, to make these arguments at his parole revocation hearing. In any case, to the extent that the argument is not about the process afforded to him, but about the substantive basis of the State's decision to revoke his parole, it is a concern of substantive due process discussed above. To the extent that Hawkins argues that Morrissey v. Brewer, 408 U.S. 471 (1972), requires additional procedural protections when the State wishes to revoke erroneously granted parole, the argument is barred by Teague v. Lane's prohibition against the creation of new procedural rules on habeas corpus review, 489 U.S. 288, 310, 319 (1989).**8**

IV.

The substantive component of the Fourteenth Amendment's Due Process Clause includes a right to the finality of a criminal sentence, once that sentence has crystallized, as described by the Fourth Circuit in Lundien and Cook. Where a parolee is unaware that his parole has been granted erroneously, and reasonably so, and where he successfully reintegrates himself into the community and substantially complies with all of his parole obligations for two years, his fundamental liberty interest in the finality of the parole decision has crystallized. By intentionally depriving Hawkins of this fundamental liberty interest, the North Carolina Parole Commission abused its power to a degree that shocks the conscience, violating Hawkins's right to sub-

_____

**8** The State's claim that all of Hawkins's arguments are new rules and thus barred by Teague is meritless. The application of the substantive due process holdings of Lundien and Cook to this new set of facts is not the creation of a new rule. And Teague only prohibits the imposition of new procedural rules on habeas, see Bousley v. United States, 118 S. Ct. 1604, 1610 (1998), of which category Hawkins's substantive due process claim is not a member.

24

stantive due process. The decision to the contrary of the district court is, therefore,

REVERSED AND REMANDED WITH
INSTRUCTIONS TO GRANT THE PETITION.

PHILLIPS, Senior Circuit Judge, dissenting:

With all respect for the majority's understandable dismay at the course of administrative bungling by state officials that this case reveals, I do not believe that the state's re-incarceration of this petitioner constituted a violation of substantive due process entitling him to the release from custody that he seeks. Accordingly, I dissent.

Courts now considering any claim of substantive due process violation must look for principal guidance to the Supreme Court's most recent deliverances on the meaning and proper method of judicial analysis of the concept in County of Sacramento v. Lewis, 118 S. Ct. 1708 (1998), and Washington v. Glucksberg, 117 S. Ct. 2258 and 2302 (1997). Though those decisions evoked a multiplicity of opinions that reflect lingering disagreements within Court majorities on the proper methodology for assessing such claims--particularly those involving executive action--I take them to establish or reaffirm for our purposes the following propositions.

1. At the outset, they remind that, as a general proposition, we must be "`reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended,'" Glucksberg, 117 S. Ct. at 2267 (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)), which means that we, like the Supreme Court, must "`exercise the utmost care whenever we are asked to break new ground in this field, [Collins, 503 U.S. at 125], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges], [Moore v. City of East Cleveland, 431 U.S. 494, 502 (1977)]." Glucksberg, 117 S. Ct. at 2268; see also Lewis, 118 S. Ct. at 1714 (noting traditional reluctance of Court to expand concept).

2. Where, as here, the claimed violation is by executive action

25

rather than by legislative enactment, judicial analysis should consider as a "threshold question" whether the executive action was so "egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 118 S. Ct. at 1717 n.8. If it does not, the claim fails on that account. If it does, inquiry must turn to whether the claimed right, if not an enumerated one, is entitled, on the basis of precedent or of historical protections afforded it, to judicial recognition as a substantive due process right to be free of such executive action. See id.[1]

_____

[1] This is the position taken in Justice Souter's opinion for the Court in Lewis, in which he was joined by Chief Justice Rehnquist and Justices O'Connor, Kennedy, Ginsburg and Breyer. Lewis thus clearly holds both that the "shocks-the-conscience" test has continued vitality in actions challenging executive acts on substantive due process grounds and that in those it should be applied as a "threshold" test. What is not perfectly clear, however, is the extent to which this threshold test is to be applied independently of any consideration of what relevant history, tradition and precedent may have to say about the asserted right and its protection. Justice Souter's opinion for the Court seems in the main to posit a completely independent threshold inquiry that focuses solely on the actor's culpability, and would turn to history, tradition and precedent only after the conduct had been found conscience-shocking, and then only to determine whether history, tradition and precedent demonstrated that the right asserted was one entitled to substantive due process protection. See Lewis, 118 S. Ct. at 1717 n.8. Responding, however, to Justice Scalia's objection to any continued use of a shocks-the-conscience test rather than relying solely on precedent and historical protections to assess substantive due process claims, Justice Souter allowed that whether particular conduct was conscience-shocking "may be informed by a history of liberty protection, but would necessarily reflect[ ] an understanding of traditional executive behavior, of contemporary practice, and of the standard of blame applied to them." Id.

Further on the point, Justice Kennedy, specially concurring and joined by Justice O'Connor, after expressing general skepticism about the "shocks-the-conscience" test, indicated that he thought it could not serve as a wholly independent test but only as the beginning point in a process that must take into account history, tradition and precedent in assessing the "objective character" of the challenged act. Id. at 1722 (Kennedy, J. concurring). Though Justice Souter's opinion seemed not to require this, Justice Kennedy thought that the "reasons" given for its "not-shocking"

26

3. If inquiry is required (or undertaken) as to whether the right asserted is entitled to recognition as one of substantive due process, the question is whether it is one of "those fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition.'" Glucksberg, 117 S. Ct. at 2268 (quoting Moore, 431 U.S. at 503), being so "'`implicit in the concept of ordered liberty' . . . that `neither liberty nor justice would exist if they were sacrificed.'" Id. (quoting Palko v. Connecticut, 302 U.S. 319, 325, 326 (1937)). And to answer that question requires a "'`careful description' of the asserted fundamental liberty interest." Id. (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)).

This prescribed methodology, avowedly designed in its threshold "shocks-the-conscience" inquiry to guard against "demot[ing]" the Constitution to a "font of tort law," Lewis, 118 S. Ct. at 1717 n.8, and, in its "fundamental-liberty-interest" inquiry, to "rein in the subjective elements that are necessarily present in due-process judicial review," Glucksberg, 117 S. Ct. at 2268, is a most stringent one. Though it builds on previous substantive due process jurisprudence, it seems to me clearly to tighten the doctrinal screws by "defining-up" both the level of executive culpability sufficiently "egregious" to "shock the contemporary conscience" and the level of specificity at which asserted substantive due process rights are to be sought in history, precedent and tradition.

Applying that tightened methodology here, I do not believe the challenged conduct can be declared to violate any substantive due process right asserted by this petitioner. First off, I do not believe the conduct qualifies as a conscience-shocker in the required sense.

The core of the concept of due process--procedural and substantive--is protection against "arbitrary action of government,"

_____

conclusion indicated that history, tradition and precedent had been sufficiently taken into account to meet his concern. Id.

From all this, I assume that courts seeking faithfully to apply the Lewis methodology in executive act cases properly may look to history for whatever it may reveal about customary executive practices and judicial responses in comparable situations by way of establishing context for their assessments of the conduct at issue.

27

Lewis, 118 S. Ct. at 1716 (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)), and "only the most egregious official conduct can be said to be `arbitrary in the constitutional sense.'" Id. (quoting Collins, 503 U.S. at 129). The "shocks the conscience" test is aimed at identifying executive conduct of that degree of culpability and therefore appropriately poses the first, antecedent, question about any claim that particular conduct violated a substantive due process right.

The test is concededly a most imprecise one, being "no calibrated yard stick," id. at 1717, and "laden with subjective assessments," id. at 1722 (Kennedy, J. concurring). But it surely gets at what has to be determined--whether government conduct has been simply "arbitrary," without reason. And, some judicial guidelines have emerged to flesh out and put at least minimum bounds on the degree of culpability it seeks to capture.

Simple negligence never can suffice to make executive conduct conscience-shocking in the required sense, no matter what the right infringed or the injury inflicted. Id. at 1718 (citing Davidson v. Cannon, 474 U.S. 344, 347-48 (1986)). And while intended conduct is that "most likely" to meet the test, even that alone will not suffice; the conduct must be "intended to injure in some way unjustifiable by any government interest." Id. (emphasis added). What the test seeks to identify is conduct by executive officials which involves "abusing [their] power, or employing it as an instrument of oppression." Collins, 503 U.S. at 126 (quotation omitted). Finally, application of this test "demands an exact analysis of circumstances," Lewis, 118 S. Ct. at 1718, because "`[t]hat which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.'" Id. at 1719 (quoting Betts v. Brady, 316 U.S. 455, 462 (1942)).

As a first step in applying the test to the specific conduct at issue here, we should take a look at how executive officials and courts generally may have responded to the problem of whether an erroneously released prisoner should be reincarcerated. Though unlikely to demonstrate conclusively that the executive act we assess was or was not "conscience-shocking," hence arbitrary in the constitutional sense, the response of other officials and courts when confronted with generally

28

comparable problems might provide helpful context for assessing its culpability. <u>See id.</u> at 1717 n.8.

The first thing revealed by even a cursory look at the available sources--judicial decisions**2** and academic commentary--is that cases involving government failures to take convicted criminals into custody and premature releases of prisoners are surprisingly widespread and recurring in both the state and federal penal systems. <u>See</u> Gabriel J. Chin, <u>Getting Out of Jail Free: Sentence Credit for Periods of Mistaken Liberty</u>, 45 Cath. U. L. Rev. 403 (1996) (collecting cases).**3** The erroneous release here was not, therefore, to start with so unique an

_____

**2** Which of course reveal only the tip of what surely is a much larger set of instances, not all of which resulted in litigation.

**3** As a raw indication of the extent of the phenomenon, this academic commentary identifies over one hundred such cases, running back in time to 1895. Broadly speaking, the cases involve one or the other of the following factual scenarios. In "delayed incarceration cases," the relevant governmental authority fails timely to take the convicted criminal into custody. <u>See</u>, <u>e.g.</u>, <u>United States v. Martinez</u>, 837 F.2d 861 (9th Cir. 1988) (seven and one-half-year delay in prisoner's incarceration). In "detainer cases," a prisoner is either released from the custody of one jurisdiction notwithstanding the fact that a valid detainer has been lodged by a second jurisdiction, <u>see</u>, <u>e.g.</u>, <u>Farley v. Nelson</u>, 469 F. Supp. 796 (D. Conn.) (defendant paroled by Maryland penitentiary and not taken into federal custody notwithstanding fact that two federal detainers were on file with the Maryland authorities), <u>aff'd</u>, 607 F.2d 995 (2d Cir. 1979), or is released by one jurisdiction because a second jurisdiction to which he owes time has failed to file a detainer. <u>See</u>, <u>e.g.</u>, <u>Shelton v. Ciccone</u>, 578 F.2d 1241 (8th Cir. 1978) (defendant released from state custody when a federal detainer should have been but was not lodged with state authorities). Finally, there are "early release cases" where, as in the case at hand, by some administrative error, a prisoner is prematurely released or paroled. <u>See</u>, <u>e.g.</u>, <u>Johnson v. Williford</u>, 682 F.2d 868 (9th Cir. 1982) (prisoner who was convicted and sentenced under a federal statute requiring a 10-year minimum sentence without possibility of parole was erroneously paroled). Although these categories account for the great bulk of the cases, not all of the cases fit neatly into them. <u>See</u>, <u>e.g.</u>, <u>Ex Parte Bugg</u>, 145 S.W. 831 (Mo. Ct. App. 1912) (prisoner intentionally released from custody on a suspended sentence because of fear that he was contracting tuberculosis and to allow him to "seek a change of climate").

29

occurrence in overall penal system administration as by that fact alone to suggest arbitrariness in the overall administrative process.

Next, it would appear that traditional and contemporary executive practice once the error is discovered has been routinely to incarcerate, rejecting any administrative claims of entitlement to freedom.**4** Neither, therefore, was the decision to reincarcerate here, rejecting the administrative claim, so much at odds with customary executive practice as to suggest arbitrariness on that account alone.

Looking past these general indications of the widespread extent of the phenomenon and the traditional executive practice in dealing with it to how the courts have dealt with it, we see several overlapping patterns that require differentiation for our purposes.

In one group of cases, challenges to reincarceration have been made and decided in whole or part on non-constitutional theories of "estoppel," see, e.g., Johnson v. Williford, 682 F.2d 868 (9th Cir. 1982) (alternative ground), or "improper installment sentence." See, e.g., White v. Pearlman, 42 F.2d 788 (10th Cir. 1930); see generally Dunne v. Keohane, 14 F.3d 335, 336-37 (7th Cir.) (Posner, C.J.) (noting that common law rule prohibiting government from "delay[ing] the expiration of the sentence either by postponing[its] commencement . . . or by releasing the prisoner for a time and then reimprisoning him" is not a "constitutional command"), cert. denied, 511 U.S. 1149 (1994). Because decisions applying these common law theories are not concerned with any threshold question of executive culpability, they have nothing to contribute on "the standard[ ] of blame," Lewis, 118 S. Ct. at 1717 n.8, to be used in applying the constitutional shocks-the-conscience test. See id. at 1717-18 (noting critical differ-

_____

**4** This is inferred from the fact that the reported decisions overwhelmingly (perhaps exclusively) concern prisoner challenges to decisions to incarcerate. While there obviously is less incentive for government to challenge contested administrative decisions not to incarcerate, such challenges must generally be possible under typical agency review procedures. See, e.g., In Re Hawley, 484 A.2d 684 (N.J. 1984) (holding that the prosecutor has the right and authority to appeal a decision of the State Parole Board); Mich. Comp. Laws Ann. § 791.234(7) ("The action of the parole board . . . is appealable by . . . the prosecutor . . . .").

ence between minimum constitutional and non-constitutional culpability levels).

In another overlapping category of cases, the prisoner has sought as relief that he be given credit on his remaining sentence for the time spent in erroneous release. See, e.g., Green v. Christiansen, 732 F.2d 1397 (9th Cir. 1984); United States v. Merritt, 478 F. Supp. 804 (D.D.C. 1979). These cases have no relevance to whether what was done here violated the right asserted by this petitioner. He was given credit against his remaining sentence for the time spent on erroneous release, (see J.A. at 34), and his claim is for the more drastic remedy of outright release to parole under the conditions erroneously granted.

When these two overlapping categories of cases are excluded as possible sources of a shocks-the-conscience benchmark for claims such as Hawkins's, only one category remains. It consists of cases in which a convicted criminal has sought release (either outright or to an erroneously granted parole) specifically on federal constitutional due process grounds and the courts have decided the claims, up or down, on that basis. Interestingly, almost all the cases decided on constitutional grounds have involved claims based on a unique sub-constitutional theory of "waiver of jurisdiction." Usually traced to Shields v. Beto, 370 F.2d 1003 (5th Cir. 1967), it employs the fictive notion that by prolonged failure to incarcerate a convict who "owes it time," a government may be held to have "waived its jurisdiction" to do so at some point in time and under certain circumstances, and that to incarcerate thereafter without "jurisdiction" violates due process.[5]

_____

**5** Shields, finding antecedents of this theory (and a related one of "implied pardon") in a few earlier federal and state cases, adopted it as circuit law in a case in which a state had reincarcerated a prisoner 28 years after it had released him in mid-sentence to another state and 18 years after the latter state had paroled him in the absence of any detainer filing by the first state. Six years later, the Fifth Circuit took the occasion in Piper v. Estelle, 485 F.2d 245 (5th Cir. 1973), to cabin in Shields facially broad rule that had seemed to rest principally on the prolonged period of government inaction, emphasizing that "lack of eager pursuit" or "lack of interest" is not enough, "[r]ather," Piper held, "the . . . action must be so affirmatively wrong or [the] inaction so grossly negligent that it would be unequivocally inconsistent with fundamental principles of liberty and justice to require [that the sentence] be served . . . ." Id. at 246 (quotation omitted). Piper's formulation of the "waiver" theory has been that ordinarily invoked by claimants and courts since that time.

31

In the overwhelming majority of cases in which this special "due process" theory has been invoked, the claims have been rejected on their widely varying facts.**6** Only a handful of decisions have found due process violations on this basis.**7**

Although these cases apply constitutional due process theory, they do not provide a serviceable benchmark for applying the threshold "conscience-shocking" test mandated by <u>Lewis</u>. None, of course, specifically applies that test as an "antecedent", independent inquiry into government culpability. Most, as indicated, reject the due process challenge on the facts. The few that uphold challenges are far too few in the overall mix and too varied on their facts to provide any firm legal norm for assessing the required culpability level under <u>Lewis</u>'s threshold test.

History and precedent thus inform our threshold inquiry with little except that the administrative error that occasioned the challenged decision is one too frequently made in penal systems administration

_____

**6** <u>See Camper v. Norris</u>, 36 F.3d 782 (8th Cir. 1994) (finding against prisoner on the facts); <u>Martinez</u>, 837 F.2d 861 (same); <u>Mobley v. Dugger</u>, 823 F.2d 1495 (11th Cir. 1987) (same); <u>Green</u>, 732 F.2d 1397 (same); <u>Mathes v. Pierpont</u>, 725 F.2d 77 (8th Cir. 1984) (same); <u>Patterson v. O'Dea</u>, 1996 WL 554564 (6th Cir. Sept. 27, 1996) (unpublished) (same); <u>Hallums v. Hambrick</u>, 1994 WL 279394 (6th Cir. June 21, 1994 (unpublished) (same), <u>cert. denied</u>, 513 U.S. 1169 (1995); <u>Mistretta v. Whalen</u>, 1993 WL 118074 (7th Cir. April 14, 1993) (unpublished) (same); <u>Christian v. Smith</u>, 1991 WL 85227 (6th Cir. May 20, 1991) (unpublished) (same), <u>cert. denied</u>, 502 U.S. 915 (1991); <u>Sterling v. Maggio</u>, 505 F. Supp. 1111 (M.D. La. 1981) (same); <u>Farley</u>, 469 F. Supp. 796 (same); <u>Bailey v. Ciccone</u>, 420 F. Supp. 344 (W.D. Mo. 1976) (same); <u>Esquivel v. Estelle</u>, 426 F. Supp. 619 (W.D. Tex. 1976) (same), <u>aff'd</u>, 547 F.2d 309 (5th Cir. 1977); <u>Clifton v. Beto</u>, 298 F. Supp. 1384 (S.D. Tex. 1968) (same), <u>aff'd on other grounds</u>, 411 F.2d 1226 (5th Cir. 1969); <u>United States v. Vann</u>, 207 F. Supp. 108 (E.D.N.Y. 1962) (same); <u>United States v. Brandt</u>, 1987 WL 16235 (N.D. Ill. Aug. 26, 1987) (unpublished) (same).

**7** <u>See Shields</u>, 370 F.2d 1003 (finding for prisoner on the facts); <u>Johnson</u>, 682 F.2d 868 (same); <u>Lanier v. Williams</u>, 361 F. Supp. 944 (E.D.N.C. 1973) (same); <u>Shelton</u>, 578 F.2d 1241 (granting defendant evidentiary hearing on issue of waiver).

to raise any presumption of arbitrariness "in the constitutional sense," Lewis, 118 S. Ct. at 1716 (quotation omitted), whenever it occurs, and that the apparently routine executive practice when the error has been discovered is to reincarcerate, no matter what the circumstances. Judicial decisions on challenges to such executive decisions provide no firm legal norm or benchmark for applying the test. Most in fact have upheld the executive decision to reincarcerate, finding no violation of the claimed legal or constitutional right to remain free. Those that have found violations--even the very few that have found violation of constitutional due process right--have done so by analyses that did not address as an independent, "antecedent," question whether the challenged decision to reincarcerate was sufficiently "egregious" to be "arbitrary in the constitutional sense." Id. at 1716 & 1717 n.8 (quotation omitted).

Here, therefore, the test must be applied simply by considering without benefit of any helpful guidance from those external sources whether the decision to reincarcerate was, within the threshold culpability test as most recently explained in Lewis , "shock[ing to] the contemporary conscience." Id. at 1717 n.8.

I do not think it possible to make that drastic judgment about this decision. Consider the critical circumstances before the Parole Commission whose decision to revoke the erroneously granted parole is the challenged executive act.

> In 1981 Hawkins had been convicted in North Carolina state court on a drug trafficking offense. Based on previous 1972 convictions in Georgia of rape and aggravated assault with intent to commit rape and a 1976 conviction in Guilford County, North Carolina for armed robbery, he was sentenced as an habitual felon to 50 years imprisonment and to a concurrent 10-year sentence on the drug trafficking offense. See State v. Simmons, 286 S.E.2d 898, 900 (N.C. Ct. App. 1982). At the time, he had an extensive record of other arrests and convictions, some under the surname "Simmons," dating back to 1967. These included a 1967 conviction for larceny and receiving; a 1969 conviction for assault on a female; a 1978 conviction for escape from work release; a 1976 grand jury charge of second degree rape that

33

was dismissed; and a 1975 Delaware charge of resisting arrest that was nol prossed. (See J.A. 161-62; 203-4.) In 1992, after having served eleven years of his 50-year sentence, he had been erroneously paroled under a recently enacted Community Service Parole program, designed in part to alleviate prison overcrowding, for which he was not in fact eligible. His overall prison record at the time had been a good one, with only a few rule infractions, and during his imprisonment he had obtained a bachelors degree in business management from Shaw University under a study program. (See id. at 26, 200.)

His erroneous release in 1992 was based on a Parole Case Analyst's recommendation that cited the amount of time he had served, the prison overcrowding crisis, the fact that none of Hawkins's prison rule infractions was assaultive, the fact that he had made some effort to improve his situation while in prison, and the fact that he would be placed on intensive supervision under the Community Service Parole program. (See id. at 200.) The recommendation had, however, noted that there was "some concern" about releasing Hawkins due to his "history of sexual assaultive behavior." (Id.) That concern had been expressed for the record by a Parole/Probation officer who indicated his strong opposition to Hawkins'/Simmons' release based upon the officer's personal awareness of his criminal history and his expressed opinion that he was a "career street criminal who will continue to commit street crimes once he is out of prison." (Id. at 156.)

During the two-year period of his release, Hawkins had lived with his brother and been continuously employed as an unskilled laborer by a manufacturing company. (See id. at 22, 26.) He had worked regularly and with good job evaluations and had violated no laws during the period, but had fallen behind in some of the community service obligations and fee payments required by the program. (See id. at 20-24, 246.)

He was taken back into custody by order of the Parole Commission when in 1994 it was realized that his release

34

had not been authorized by law. (See id. at 34.) And, after affording him a hearing with counsel at which his return to parole status was urged on legal and humanitarian grounds, (see id. at 29-30, 120-21), the Commission had formally revoked his parole and ordered his reincarceration. (See id. at 32, 34.)

To declare the Parole Commission's decision so "egregious and outrageous" as to "shock the contemporary conscience" under these circumstances, we would have to believe that it was infected or driven by something much worse--more blameworthy--than mere negligence or lack of proper compassion or sense of fairness or than might invoke common law principles of estoppel or fair criminal procedure or the like to hold the state to its error. To keep things in constitutional proportion, we would have to see in it a mindless "abus[e of] power," or a deliberate exercise of power "as an instrument of oppression," Collins, 503 U.S. at 126 (quotation omitted), or power exercised "without any reasonable justification in the service of a legitimate governmental objective," Lewis, 118 S. Ct. at 1716.

I do not believe the Parole Commission's decision can be characterized as one meeting that stringent threshold constitutional test. Nothing about it suggests any element of vindictiveness or of power exercised simply to oppress. There were legitimate governmental interests and objectives a-plenty to justify the act. It rectified an error in administering applicable state parole law, thereby furthering the state's fundamental interest in correct application of its laws. In doing so, it avoided the precedential risk of acquiescing in irregular enforcement of state law. It reincarcerated under more secure custody a recognized high-risk prisoner erroneously released under a program driven largely by exigencies of prison crowding unrelated to the public interest in security against the specific risk he posed.

While the Commission's conduct leading up to and including erroneous release on parole was bungling at every step, it could not at that stage be characterized as anything but simple negligence. And, in the end, that negligent course of conduct had nothing to do with revocation of the parole actually granted far in advance of the parole release dates about which Hawkins was several times negligently misinformed. While the Commission's course of bungling is not a pretty

35

picture, it has no real bearing upon the question whether revocation of the completely unpredicted earlier parole was conscience-shocking.

Finally, while the revocation undoubtedly had harsh and regrettable consequences for Hawkins's erroneously created expectations, it did not, fortunately, interrupt any third party dependency relationship established in the interim. And, though Hawkins had not engaged in any criminal conduct during the period of his release under the "intensive supervision" of his parole, that surely could not be thought to oblige the Commission to see in this a safely demonstrated rehabilitation from Hawkins's established pattern of assaultive behavior while not in full custody. Certainly a declination to do so could not be thought to demonstrate arbitrariness as opposed to reasoned judgment.

Because I do not believe that the Parole Commission's decision can be declared "so egregious, so outrageous . . . [as] to shock the contemporary conscience", see Lewis, 118 S. Ct. at 1717 n.8, I would affirm on that ground the district court's denial of the petition. So holding, I would not reach the more fundamental issue that lies beyond: whether the specific right asserted here even concerns a liberty interest so fundamental that it is protected by the substantive component of the Due Process Clause. See id. (differentiating the issues). Because a majority of the panel has, however, held that the conduct was conscience-shocking, thereby raising the further issue, I address it briefly and, with respect, again disagree with the majority.

My reasons can be given simply and briefly. Based upon the historical evidence earlier discussed, I do not believe the liberty interest asserted here--that of remaining free on erroneously granted parole so long as the parolee did not contribute to the error and has for an appreciable time remained on good behavior to the point that his expectations for continued release from incarceration have "crystallized"[8]--is one that can be said to be "deeply rooted in this

_____

[8] This seems to me a fair and "careful description" of the "fundamental liberty interest" asserted by petitioner in this litigation. See Glucksberg, 117 S. Ct. at 2268 (noting necessity for such a"description" in making historical inquiry). A critical feature of the interest as asserted is its basis in "crystallized" expectations created by the passage of time, (see Appellant's Br. at 11), surely an amorphous concept upon which to ground constitutional right, particularly one as jealously guarded against subjective expansion as substantive due process.

36

Nation's history and traditions." Glucksberg, 117 S. Ct. at 2268 (quoting Moore, 431 U.S. at 503)). Certainly it would seem impossible to say of such an interest that it is one of those so"`implicit in the concept of ordered liberty,' . . . that `neither liberty nor justice would exist if they were sacrificed.'" Id. (quoting Palko, 302 U.S. at 325, 326. What history and tradition seem to indicate in their best light for petitioner is that claims of such a right have been routinely rejected when made to executive branches of government, occasionally, but not always, upheld by courts when advanced under common law theories such as estoppel, and almost always rejected by courts when advanced on constitutional grounds. For that reason, I do not believe that under current Supreme Court jurisprudence as most recently explicated in Glucksberg, the interest asserted here could be considered one entitled to substantive due process protection.**9**

_____

**9** Hawkins's reliance on United States v. Lundien, 769 F.2d 981 (4th Cir. 1985), cert. denied, 474 U.S. 1064 (1986), and United States v. Cook, 890 F.2d 672 (4th Cir. 1989), as establishing circuit precedent for the existence of such a right is misplaced. Those cases considered constitutional challenges to the power of courts to increase sentences after their formal imposition. In both cases, the courts posited that at some point a prisoner's crystallized expectations of the duration of his sentence as imposed could give rise to a due process right to its finality, but both found no such right to have arisen on the facts of the cases. See Lundien, 769 F.2d at 987; Cook, 890 F.2d at 675. Aside from the fact that the due process assumptions made in those cases were dicta in view of their specific holdings, they could not be taken to apply even as persuasive dicta in the quite different situation of the erroneously released prisoner that we consider. Neither Lundien nor Cook undertook the rigorous historical inquiry now mandated by Glucksberg into whether the specific right they posited--that of sentence finality--was one sufficiently rooted in history and tradition to be enforced as one of substantive due process. And had that inquiry been undertaken, it would have been an entirely different one, concerning a different subject than that required in this case. Lundien and Cook therefore have nothing to say, either as precedent or persuasive dicta, about whether the sufficiently different liberty interest asserted by Hawkins is entitled by history and tradition to substantive due process protection.

37